TRUSTEES FOR ALASKA, Northern Alaska Environmental Center, The Sierra Club, The National Parks and Conservation Association, and The Wilderness Society, Appellants,

v.

STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES; State of Alaska Office of Management and Budget, Appellees.

No. S–4591.

Supreme Court of Alaska.

April 23, 1993.

Rehearing Granted in Part and Opinion Amended April 23, 1993.

Randall M. Weiner, Trustees for Alaska, Anchorage, for appellants.

Douglas S. Parkinson, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellees.

Carl J.D. Bauman, Clyde E. Sniffen, Jr., Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for amici curiae, ARCO Alaska, Inc., BP Exploration (Alaska) Inc., Chevron U.S.A., Inc., and Phillips Petroleum Co.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### INTRODUCTION

The appellants in this administrative appeal are five environmental groups ("Trustees"). Trustees sued the State challenging the State's sale of oil and gas leases in Camden Bay, Alaska ("Sale 50"). The State's Department of Natural Resources ("DNR") determined that Sale 50 is consistent with the Alaska Coastal Management Program ("ACMP"), AS 46.40.010–210. Trustees alleged that DNR's consistency determination is inadequate. The superior court disagreed and upheld DNR's consistency determination. Trustees appeal.

This is the second time this case has come before us. In our previous opinion in this case, *Trustees for Alaska v. State, Department of Natural Resources*, 795 P.2d 805 (Alaska 1990) ("*Trustees I*"), we stated the facts as follows:

> The state held Sale 50 on June 30, 1987. The oil and gas development rights to 118,147 acres of offshore state land in Camden Bay, 35 tracts in all, were offered and sold. Camden Bay is located on the northern coast, west of

Kaktovik and north of the Arctic National Wildlife Refuge ("ANWR").

Trustees challenged the decision of the Department of Natural Resources ("DNR") to proceed with Sale 50. This decision was reflected in DNR's Final Best–Interests Finding. On June 1, 1987, Trustees filed a motion with DNR to reconsider its Sale 50 decision. DNR did reconsider, but declined to change its decision. Trustees filed suit. Their motion for a preliminary injunction was denied, and Sale 50 proceeded as scheduled on June 30, 1987.

In July 1987, Trustees agreed to dismiss their prior action for declaratory relief, and instead brought this administrative appeal. The trial court upheld Sale 50 in every respect. Trustees now appeal.

. . . .

The Alaska Coastal Management Program ("ACMP") protects numerous environmental and cultural values in Alaska's coastal zone. When a project requires two or more state or federal permits, leases, or authorizations, the Office of Management and Budget (OMB) must render a finding as to whether the project is consistent with the ACMP. In this case, however, DNR performed the consistency review.

*Id.* at 806, 811 (footnotes omitted; citations omitted). Trustees argued that the State's approval of Sale 50 was improper both because the wrong state agency made the State's consistency determination, *id.* at 811, and because the determination was inadequate. We agreed with Trustees' first argument. Since the project required more than two leases, we held that OMB was required to make the consistency review and that it could not delegate this

statutory duty to DNR. *Id.* at 811–12. We remanded this case for the superior court to order OMB to perform a consistency review.[1] *Id.* at 812. Consequently, we did not address the adequacy of DNR's consistency determination. *Id.* at 812 n. 13.

In accord with our decision, the superior court ordered OMB to perform a consistency determination. However, the legislature subsequently amended AS 44.19.-145(11) to permit DNR to make consistency determinations. This change was made retroactive to March 11, 1984. DNR thus became the appropriate agency to make the consistency determination in the present case. Consequently, the superior court vacated its order requiring OMB to make a consistency determination. Trustees again appeal the adequacy of DNR's consistency determination.[2]

## DISCUSSION

### A. *Record Support for the Consistency Finding*

6 AAC 80.010(b) requires that "uses and activities" conducted by state agencies in coastal areas must be "consistent" with the standards of the ACMP.[3] In *Hammond v. North Slope Borough,* 645 P.2d 750, 761 (Alaska 1982), we recognized that by implication this regulation requires that a state agency may only authorize a use or activity in a coastal area if it finds that the use or activity is consistent with ACMP standards.

Trustees contend that DNR's consistency determination is without adequate support in the record with respect to ACMP standards concerning (1) geophysical hazards, (2) historic, prehistoric, and archeological resources, and (3) transportation and utili-

---

**1.** We also remanded for DNR to "consider the unique risks presented by the oil transportation methods that would be necessary if the legal status of ANWR remains unchanged." *Id.* at 811. DNR complied and issued supplemental findings. In the present appeal, Trustees do not challenge the adequacy of those findings.

**2.** DNR's consistency determination is one section of its finding, made in accordance with AS 38.05.035(e), that Sale 50 would serve the State's best interest.

**3.** 6 AAC 80.010(b) provides, in relevant part:

> Uses and activities conducted by state agencies in the coastal area must be consistent with ... the standards contained in this chapter. In authorizing uses or activities in the coastal area under its statutory authority, each state agency shall grant authorization if ... the agency finds that the use or activity is consistent with ... the standards contained in this chapter.

ties. We examine this argument as it pertains to each of those standards.

## 1. *Geophysical Hazard Areas*

The ACMP regulation applicable to geophysical hazard areas provides:

(a) Districts and state agencies shall identify known geophysical hazard areas and areas of high development potential in which there is a substantial possibility that geophysical hazards may occur.

(b) Development in areas identified under (a) of this section may not be approved by the appropriate state or local authority until siting, design, and construction measures for minimizing property damage and protecting against loss of life have been provided.

6 AAC 80.050.

There are thus two potentially applicable regulatory commands. The first is that areas with known or substantially possible geophysical hazards be identified. The second is that development in such areas not be approved unless adequate protective measures have been provided.

Trustees are concerned specifically with those geophysical hazards associated with earthquakes. Trustees argue that DNR's failure to identify specific faults in Camden Bay "makes it impossible to tailor a sale to reduce the seismic risks by, for example, excluding lease tracts along major fault lines." Trustees' argument continues:

If a company purchases a lease in a seismically active area, undertakes the expense of exploration, and determines that producible quantities of oil are present, both DNR and the company may find it difficult to slow the momentum to produce. With geophysical hazard areas identified before the sale, both DNR and

the oil companies would be able to internalize the added risks, thereby increasing the likelihood that sales, explorations and production will occur in more seismically stable areas.

DNR replies that it identified the entire Sale 50 area as a geophysical hazard area.[4] DNR thus argues that 6 AAC 80.050 will be complied with so long as development is not approved until siting, design and construction measures for minimizing property damage and protecting against loss of life have been provided for. In addition, the leases stipulate that the lessees must submit a detailed plan of operations for approval before conducting exploratory or development work. These plans must identify specific measures to meet specific geophysical hazards which may exist at the development site.

 Trustees counter that identification of the entire sale area as an area of known geophysical hazard makes a mockery of the regulation and that DNR should undertake seismic studies prior to the sale to identify particular areas having special hazards.

The regulation does not support Trustees' contention that DNR should have undertaken seismic studies to determine areas of particular hazard within the sale area. The regulation limits the duty of the appropriate state agency to identifying *known* or, as to areas of high development potential, *substantially possible* hazard areas. This clearly implies a duty to conduct a survey of available sources concerning hazards in the sale area and to report the results of such a survey, but it excludes a requirement to conduct field studies.

DNR's summary statement that the entire Sale 50 area is a "known geophysical

---

**4.** The decisional document notes the "occurrence of numerous faults and shallow earthquakes in the area. The magnitude of the earthquakes ranges from 1.0 to 5.3 on the Richter scale." The State also cites a draft environmental impact statement for a federal sale just north of Sale 50 which indicates the presence of numerous faults and earthquake epicenters in Camden Bay. Vol. 64:009627. The federal statement deals with faults and earthquakes in the Camden Bay area in much greater detail

than the State's decisional document. The federal draft environmental impact statement states:

Earthquakes indicate active movement along the faults in the Camden Bay area and tend to occur along the axes of anticlines and synclines. They are part of the central Alaska Seismic system. Most of the earthquakes recorded since 1968 range in magnitude from 3.0 to 4.0.

Vol. 64:009625.

hazard" does not satisfy the regulatory requirements. We have already recognized that Sale 50 triggered the regulatory requirement of a "conclusive" ACMP consistency determination. *Trustees I,* 795 P.2d at 811–12. DNR therefore had the duty to determine whether the sale of oil and gas leases was consistent with the ACMP.

▰▰▰ The ACMP has, among its objectives, protecting numerous environmental and cultural values in Alaska's coastal zone. AS 46.40.020. As we have elsewhere had occasion to note, the ACMP's standards are extremely protective of the environment. *Hammond,* 645 P.2d at 761. Offshore areas are among the habitats subject to the Alaska coastal management program. 6 AAC 80.130(a)(1). Such habitats "must be managed so as to *maintain* or *enhance* the biological, physical, and chemical characteristics of the habitat which contribute to its capacity to support living resources." 6 AAC 80.130(b) (emphasis added). Uses or activities that fail to maintain or enhance the habitat's capacity to support living resources may be authorized only if several stringent additional conditions are met.[5] 6 AAC 80.130(d).

Given these strongly protective standards, it cannot be said that the decision to sell leases will invariably and automatically be consistent with the ACMP. The geophysical hazards in a given area could be such as to make any use or activity inconsistent with the ACMP. Where detailed knowledge is available, indiscriminate and conclusory identification of an entire sale area as a geophysical hazard area does not suffice to comply with 6 AAC 80.050(a).[6]

In addition, deferring a careful and detailed look at particularized geophysical hazards to later stages of the development process, as DNR evidently intends, entails certain practical risks.[7] First, DNR's method means that particularized geophysical hazards will be considered on a lease-site-by-lease-site basis. This may tend to mask appreciation of any cumulative environmental threat that would otherwise be apparent if DNR began with a detailed and comprehensive identification of those hazards.[8] Second, as we noted in *Trustees for Alaska v. Gorsuch,* 835 P.2d 1239, 1246 n. 6 (Alaska 1992), the more segmented an assessment of environmental hazards, the greater the risk that prior permits will compel DNR to approve later, environmentally unsound permits.

> Geophysical hazards are considered when plans of operation are reviewed. Lessees must submit a detailed plan of operations to the Division of Oil and Gas for approval before conducting any exploratory or development operations. Plans of operations must identify the specific measures, design criteria and construction methods and standards that will be employed to meet any potential geophysical hazard that may exist at the development site. Term 3 requires consistency with ACMP.

---

5. These conditions are discussed in section C, *infra.*

6. In the context of a finding that a sale is in the State's best interest, we have recognized that "the mere decision to lease does not in itself bring about great risks to the environment." *Hammond,* 645 P.2d at 759. We also noted that because "[e]xploration and development will take place over time ... adjustments can be made, if and when new data is acquired that reveals *additional* hazards." *Id.* (emphasis added). In *Hammond* we also required that the consistency determination scrupulously adhere to the regulatory requirements. We noted that uses and activities may be allowed if approved under either of two alternative tests. *Id.* at 762. The Commissioner's consistency determination failed to make clear which of the tests had been used. For this reason, we remanded the case to the Commissioner with instructions to reconsider his decision and to address the specific environmental protections encompassed in the regulations. *Id.* As in *Hammond,* we continue to expect state agencies to give faithful and scrupulous attention to the clear requirements of their regulations.

7. DNR's consistency determination states:

8. We expressed the need for an early review of cumulative environmental impacts in *Trustees for Alaska v. Gorsuch,* 835 P.2d 1239 (Alaska 1992). We stated that environmentally protective

> purposes require that at the time DNR reviews any ... permit application it consider the probable cumulative impact of all anticipated activities which will be a part of [the project in question], whether or not the activities are part of the permit under review. If DNR determines that the cumulative impact is problematic, the problems must be resolved before the initial permit is approved.

*Id.* at 1246.

In light of these considerations, and given the plain language of the regulation, we conclude that this case must be remanded to DNR with instructions to identify and report on known and, as to areas of high development potential, substantially possible areas of geophysical hazards within Sale 50.

### 2. *Historic, Pre–Historic and Archeological Resources*

The applicable standard pertaining to historic, prehistoric and archeological resources (henceforth, archeological sites) is 6 AAC 80.150. 6 AAC 80.150 provides:

Districts and appropriate state agencies shall identify areas of the coast which are important to the study, understanding, or illustration of national, state, or local history or prehistory.

The regulation therefore directly commands state agencies to identify areas of the coast that are important to the study, understanding, or illustration of relevant history or prehistory.

 Although the record includes a number of studies identifying onshore archeological sites adjacent to the sale area, DNR did not conduct cultural resource surveys regarding archeological sites within the sale area. Instead, it delegated this task to the Sale 50 lessees, and required them to carry it out if and when they explored and developed the leased sites.[9]

9. The consistency determination states that

Stipulation 1 requires the lessee to report the discovery of any site, structure, or object of historical or archeological significance and to make every reasonable effort to preserve and protect the site, structure, or object until direction is given by DNR regarding its protection. Term 22 requires that an archeological survey be completed before an area is affected by oil and gas activity....

10. In regard to this regulation, DNR provided the following in its consistency determination:

This standard requires that districts and appropriate state agencies shall identify areas of the coast which are important to the study, understanding, or illustration of national, state or local history or prehistory. In recognition that future oil and gas related activity may result in the identification of currently unknown resource sites, Stipulation 1 requires the lessee to report the discovery of

DNR defends its decision to delegate and postpone identifying archeological sites as follows. It argues that 6 AAC 80.150 does not require it to identify such sites prior to a lease sale. Instead, DNR reads the regulation as leaving it the discretion to determine *"how* and *when* such identification must take place." Its decision not to identify archeological sites at the lease sale stage was appropriate because "[t]he existence of ... such resources on offshore areas is unlikely," because DNR and the Sale 50 leases stipulated that the lessee would "report the discovery of any such resources and ... make every reasonable effort to protect them ... until instructed by DNR,"[10] and because any development of the leased sites will be subject to an independent ACMP consistency review. Finally, DNR argues that it would be poor public policy for a court to require it "to conduct and pay for detailed studies prior to merely conducting an oil and gas lease sale which authorizes no activity to take place on the leased tracts."

DNR's decision to defer identification of archeological sites does not comply with 6 AAC 80.150. The regulation clearly requires the identification of archeological sites, but it does not state when they are to be identified. In the context of an oil lease sale, there are a number of possible ways that the regulation may be interpreted. Identification may be required: 1) before

any site, structure, or object of historical or archeological significance and to make every reasonable effort to preserve and protect the site, structure, or object until direction is given by DNR regarding its protection. Term 22 requires that an archeological survey be completed before an area is affected by oil and gas activity. Term 3 requires consistency with ACMP.

In another portion of its best interests finding, DNR provided the following:

*Cultural resource sites*—It is not likely that any cultural sites would be identified within the sale area since it is offshore. However, no cultural resource surveys have been conducted in the area, and the discovery of sites, especially in the nearshore areas, should not be ruled out.

....

Lessees may discover cultural resources as a result of activities related to Sale 50. Stipulation 1 will [protect those resources].

any sale; 2) at the time permits for exploration activity are sought; or 3) at the time permits for development are sought. There are also at least two possible levels of identification: 1) identification of known sites, necessitating only literature surveys and personal contact with individuals who may have knowledge concerning such sites; and 2) identification of unknown sites, necessitating field surveys and exploration. In our view the regulation is most reasonably interpreted to require, among other things, the identification of known archeological sites at the initial sale stage. Our reasons parallel those set forth above concerning the need to identify geophysical hazards.

■ Protection and preservation of archeological sites is an objective of the ACMP. The statute requires that the ACMP

shall be consistent with the following objectives:

. . . .

(5) the protection and management of significant historic, cultural, natural and aesthetic values and natural systems or processes within coastal area[.]

AS 46.40.020. It may be that a particular area is so rich in archeological values that it could not be sold consistently with the ACMP. Further, reliance on the lessees to separately evaluate each lease on a site-by-site basis runs the risk of undervaluing the cumulative cultural significance of the region as a whole. Moreover, the lessees may have a conflict of interest that leads to the underreporting of archeological sites, since the presence of a site on a leasehold may make its development more difficult and costly. These possibilities may be remote in the context of an offshore lease sale. However, compliance with the identification requirement at the sale stage is not difficult, and our decision in this case will apply to future cases where archeological sites may be more abundant.

Our holding that 6 AAC 80.150 requires identification of known archeological sites before a lease sale does not mean that more intensive duties are not required by this regulation at later stages of develop-

ment. Nor does it mean that archeological sites are necessarily of overriding importance under the ACMP. What it does mean is that a regulation that calls for the State to identify areas that are important archeologically cannot be ignored when the State takes a significant step in committing an area to a particular type of development. DNR must comprehensively survey the known data, set out the results, and state its conclusions. As it has not done so in this case, a remand to DNR is necessary.

### 3. Transportation Routes and Utility Sites

■ The applicable regulation concerning transportation and utilities provides:

(a) Transportation and utility routes and facilities in the coastal area must be sited, designed, and constructed so as to be compatible with district programs.

(b) Transportation and utility routes and facilities must be sited inland from beaches and shorelines unless the route or facility is water-dependent or no feasible and prudent inland alternative exists to meet the public need for the route or facility.

6 AAC 80.080. DNR's decision to sell oil leases in Camden Bay unquestionably did not directly violate 6 AAC 80.080. Until exploration is proposed and, in all likelihood, until and unless a commercially exploitable discovery is made, there will be no occasion for siting, designing or constructing transportation and utility routes. Consequently, the decision to sell oil leases cannot be inconsistent with this standard and DNR's consistency determination may not be found to have been erroneous on that ground.

### B. Adequacy of DNR's Mitigation Measures

■ Trustees' second major argument is that DNR's consistency determination is inadequate because it lacks "an objective evaluation of whether the mitigation measures [proposed by DNR for inclusion in the leases] will work under the conditions prevalent in the Camden Bay area, and whether, even if they work, the activity will

then be consistent with the coastal management program." In short, Trustees argue that DNR was arbitrary and capricious because it never addressed the effectiveness of the mitigating measures on which it relied to conclude that the sale is consistent with ACMP standards.

DNR responds that "DNR's mitigation measures are arguably not even required at the lease sale stage, but even if required, are as thorough and forward-looking as they can be as a practical matter at the lease sale stage."

We have already noted that DNR erred in failing to discharge its responsibility to identify known geophysical hazard areas and archeological sites prior to the lease sale. Trustees seek to impose an additional duty, requiring DNR to evaluate the effectiveness of mitigating measures before even receiving detailed development proposals. We find DNR's position reasonable. In our view, DNR's mitigation measures provide sensible guidelines to minimize the harmful effects of oil and gas development. Most importantly, the lessees cannot develop their leases until they submit detailed plans, which must satisfy the ACMP regulations. If the plans do not satisfy the ACMP regulations, DNR can impose additional mitigation measures that assure that the regulations are complied with. Thus we reject Trustees' argument to the extent that it would tie the reasonableness of DNR's consistency determination to its developing and assessing detailed mitigation measures even before knowing which activities it needs to mitigate.

C. *DNR's Findings under 6 AAC 80.-130(d)*

■■■ As part of its consistency determination, ACMP also requires DNR to determine whether the proposed development would "maintain and enhance" the coastal habitat. 6 AAC 80.130(b), (c). If the proposed development would not maintain and

enhance the coastal habitat, then it must satisfy the standards of 6 AAC 80.130(d). 6 AAC 80.130(d) provides:

Uses and activities in the coastal area which will not [maintain and enhance the coastal habitat] may be allowed ... if the following are established:

(1) there is a significant public need for the proposed use or activity;

(2) there is no feasible prudent alternative to meet the public need for the proposed use or activity which would [maintain and enhance the coastal habitat]; and

(3) all feasible and prudent steps to maximize conformance with [this section's goal of maintaining and enhancing the coastal habitat] will be taken.

DNR analyzed the criteria of 6 AAC 80.-130(d) and concluded that Sale 50 satisfied them. Trustees argue that DNR's analysis is inadequate.

■■■ Our review is limited to ensuring that DNR's decision was not arbitrary, capricious, or unreasonable. *Hammond,* 645 P.2d at 758–59. DNR's analysis of 6 AAC 80.130(d) satisfies this standard. It is clear that DNR has taken a hard look at this issue. DNR identified twenty lease stipulations expressly designed to achieve maximum compliance with the goals of maintaining and enhancing the coastal habitat. Even though the Sale 50 area is entirely composed of offshore areas, DNR recognized and sought to compensate for possible impact on such adjacent habitats as estuaries, wetlands and tideflats, barrier islands and lagoons, rivers, streams and lakes, and important upland habitats. To this end, the lease terms range from general requirements of consistency with the ACMP to specific provisions aimed at particular problems.[11]

DNR also acknowledged that despite these precautions, development would to some extent degrade the environment and thus could not satisfy the standards contained in 6 AAC 80.130(b) and (c). It there-

---

11. Term 3 of DNR's consistency determination requires consistency with the ACMP; other terms impose such requirements as that explosives not be used in open water areas (Term 6);

that gravel be reused (Term 26); and that use of pesticide be limited to protect peregrine falcons (Term 29).

fore set out and discussed each part of the tripartite 6 AAC 80.130(d) test. For each part of the test DNR articulated its reasoning and concluded that Sale 50 met that part of the test. It specifically concluded that there is a significant public need to conduct the sale; that there is no feasible and prudent alternative; and that the lease terms and stipulations complied with ACMP standards and minimized the sale's impact on the environment. In short, DNR's analysis demonstrates a reasonable basis for its conclusion. Therefore we reject Trustees argument.

CONCLUSION

This case is REMANDED to the superior court with instructions to remand to DNR for further action in accordance with this opinion.