GREENPEACE, INC., Appellant,

v.

STATE of Alaska, OFFICE OF MANAGE-
MENT AND BUDGET, DIVISION OF
GOVERNMENTAL COORDINATION
AND ALASKA COASTAL POLICY
COUNCIL, and British Petroleum Ex-
ploration (Alaska), Inc., Appellees.

No. S–10040.

Supreme Court of Alaska.

Oct. 16, 2003.

Rehearing Denied Dec. 3, 2003.

Nancy S. Wainwright, Law Offices of Nan-
cy S. Wainwright, Anchorage, for Appellant.

Kirsten Swanson, Assistant Attorney Gen-
eral, and Bruce M. Botelho, Attorney Gener-
al, Juneau, for Appellee State of Alaska.

Jeffrey M. Feldman, Susan Orlansky, and
Ruth Botstein, Feldman & Orlansky, Anchor-
age, for Appellee BP Exploration (Alaska),
Inc.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Greenpeace Inc. appeals a determination by the State of Alaska that the Northstar Project—a plan to develop an offshore oilfield in the Beaufort Sea near Prudhoe Bay—is consistent with the Alaska Coastal Management Program. Greenpeace challenges the state's consistency ruling on two legal grounds, arguing that it is deficient as a matter of law because it fails to conduct an analysis of the Northstar Project's cumulative impacts and because it improperly "phases" the project. We reject these arguments, holding that Alaska law did not require a formal cumulative impacts analysis and that the state's consistency review did not improperly treat Northstar as a phased project.

## II. FACTS AND PROCEEDINGS

This appeal arises from a plan to develop Alaska's first offshore oil facility and subsea oil pipeline in the Northstar Unit, an oilfield in the Beaufort Sea near Prudhoe Bay.[1] In 1995 British Petroleum Exploration (Alaska), Inc., bought four oil and gas leases in the Northstar Unit from another oil company and renegotiated the existing leases with the state.[2] In March 1995 BP and the Department of Natural Resources reached an agreement, contingent on legislative approval, that gave BP better earnings potential but allowed the state to terminate the leases if BP failed to begin development in three years.[3] The legislature passed a bill approving the arrangement, and Governor Knowles signed the bill into law in July 1996.[4]

Because of the Northstar Project's magnitude, BP needed permits from at least four state agencies and five federal agencies. Under the Alaska Coastal Management Pro-

gram (ACMP),[5] any project having impacts in a coastal area of Alaska and requiring multiple permits must undergo a comprehensive review to determine its consistency with Alaska's coastal management standards.[6] The Division of Governmental Coordination (DGC)—a division of the Governor's Office of Management and Budget—is responsible for conducting the review and issuing the consistency determination.[7] Under federal law, BP additionally needed to submit the project to the United States Army Corps of Engineers for an Environmental Impact Statement under the National Environmental Policy Act. To simplify this overall process, DGC and the Corps of Engineers coordinated their reviews of BP's Northstar development plan.

BP completed the first step in the Northstar Project's ACMP review process by submitting a completed Coastal Project Questionnaire in October 1996 and a final project description in early 1997. DGC issued a letter initiating the consistency review in June 1998, soliciting public comment on the Northstar Project, which by then was described in detail in the Appendix to the Draft Environmental Impact Statement. Greenpeace submitted extensive comments on the project. In early 1999, DGC issued a Proposed Consistency Determination finding the Northstar Project to be consistent with ACMP's standards. Greenpeace petitioned the Alaska Coastal Policy Council for review to determine whether the proposed consistency ruling fairly considered Greenpeace's comments. On February 4, 1999, immediately after the Council unanimously upheld the proposed consistency ruling, DGC issued its Final Consistency Determination.

Greenpeace appealed to the superior court. After extensive briefing, Superior Court Judge John Reese affirmed DGC's consistency determination.

---

1. We discussed the history of the Northstar Project in detail in *Baxley v. State,* 958 P.2d 422, 425–28 (Alaska 1998); *see also Edwardsen v. United States Dep't of the Interior,* 268 F.3d 781, 783 (9th Cir.2001).

2. *Baxley,* 958 P.2d at 427.

3. *Id.* at 426.

4. *Id.* at 427.

5. AS 46.40.010 *et seq.* (1977) (amended 2003) (making no relevant, substantive changes).

6. *See* 6 Alaska Administrative Code (AAC) 50.070(a) (1984) (repealed 2003).

7. *See* 6 AAC 50.030 (1984) (repealed 2003).

Greenpeace appeals the superior court's ruling.

## III. DISCUSSION

Greenpeace frames two legal questions on appeal: (1) whether DGC violated the ACMP as a matter of law by failing to address the Northstar Project's cumulative impacts, and (2) whether DGC unlawfully phased Northstar by allowing BP to commence the project with certain previously issued permits that received no ACMP review and by finding certain aspects of the project consistent with the ACMP despite a lack of adequate available information essential to the consistency determination.

### A. Standard of Review

■ In reviewing ACMP consistency decisions to determine if the record supports the DGC's rulings, we usually apply a highly deferential standard, asking only if the agency has taken a "hard look at the salient problems and has genuinely engaged in reasoned decisionmaking."[8] But here, Greenpeace insists that its two points on appeal pose legal questions involving statutory and constitutional interpretation, so that we owe no deference to the agency and must use our independent judgment on review. We agree: neither of Greenpeace's points on appeal challenges the sufficiency of specific evidence or the reasonableness of the agency's findings on substantive grounds; both simply ask us to determine as a matter of law whether the DGC followed the procedural require-

ments for cumulative impacts analysis and phasing that, according to Greenpeace, are mandated by the law governing ACMP review. We use our independent judgment when deciding procedural issues involving legal interpretation.[9]

### B. Cumulative Impacts

Greenpeace first contends that the DGC's consistency determination is legally flawed because it fails to evaluate or analyze the Northstar Project's cumulative impacts. In advancing this argument, Greenpeace advocates the broad definition of cumulative impacts that federal agencies apply in preparing environmental impact statements under the National Environmental Policy Act (NEPA).[10] As Greenpeace describes it, this commonly understood definition of cumulative impact is: *the impact on the environment which results from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions.*[11]

According to Greenpeace, Alaska law required the Northstar Project's consistency determination to include a formal discussion applying this definition of cumulative impacts.

BP and the DGC eschew NEPA's definition of cumulative impacts, maintaining that, "[a]s used in the [Alaska] statutes and cases, the concept of 'cumulative impacts' is better described as 'whole-project analysis.' " As BP puts it, under Alaska law, "DGC is not required to assess the possible effects of

---

**8.** *Kachemak Bay Conservation Soc'y v. State, Dep't of Natural Res.,* 6 P.3d 270, 275 (Alaska 2000); *Ninilchik Traditional Council v. Noah,* 928 P.2d 1206, 1210 (Alaska 1996); *Trustees for Alaska v. State, Dep't of Natural Res.,* 851 P.2d 1340, 1347 (Alaska 1993).

**9.** *Kachemak Bay Conservation Soc'y,* 6 P.3d at 275–76. Because we ultimately affirm the DGC's consistency determination under the independent judgment standard, we need not decide whether the issues on appeal implicate specialized agency expertise, knowledge, or experience of the kind that would justify deference to the DGC's interpretation of applicable regulations or statutes. *See, e.g., Northern Timber Corp. v. State, Dep't of Transp. & Pub. Facilities,* 927 P.2d 1281, 1284 n. 10 (Alaska 1996).

**10.** Federal regulations applying NEPA define a cumulative impact as

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (2002); *see also* 40 C.F.R. § 1508.1 (stating terminology under NEPA is uniform throughout federal government).

**11.** (Emphasis in original.) Greenpeace describes this definition as "consistent with that found in NEPA regulations at 40 C.F.R. § 1508.7." We have quoted that regulation in note 10 above.

future development projects. DGC *is* required to undertake a whole-project analysis of a project under review, and it diligently completed such an assessment for Northstar." In BP's view,

[n]o authority supports Greenpeace's expansive interpretation of the term "cumulative impacts." Rather, applicable statutes and regulations, agency practice, and the existing decisional law all mandate a contrary result: DGC must carefully evaluate the combined impacts of all aspects of the project under review, but it need not examine the project in light of hypothetical or proposed future development in the region.

■ In our judgment, BP's and DGC's arguments are persuasive. Greenpeace argues that a legal mandate for cumulative impacts analysis can be gleaned from many sources: various ACMP standards; an Alaska Attorney General's opinion; DGC agency practice; our own prior holdings; the Alaska Constitution and the state's traditional public trust responsibilities; and various federal-law mandates. Yet these sources provide no convincing support for Greenpeace's theory that ACMP consistency determinations must formally analyze a project's cumulative impacts, applying the federal definition of cumulative impacts.

Apart from a recently enacted provision of Alaska's coastal management act that applies exclusively to phased-project review,[12] Alaska's statutes and regulations are largely silent concerning the need for cumulative impacts analysis during ACMP consistency review.

Greenpeace notes that the federal government's Final Environmental Impact Statement evaluating the Alaska Coastal Management Program described the ACMP's standards as encompassing a "general balancing process taking account of public need, alternatives, cumulative effects and effects on wetlands, fish and wildlife, water quality, scenic and recreational values, public safety, water dependence, and access to coastal waters."[13] Moreover, for various purposes arising under the ACMP, AS 46.40.210(7) defines a "use of direct and significant impact" in a way that considers the cumulative effects of the use.[14] Yet neither of these general provisions adopts NEPA's rigorous definition of cumulative impacts or purports to require that a formal cumulative impact analysis be a regular part of the ACMP consistency review process.[15]

Nor can we glean such a requirement from the ACMP's broad statement of objectives,[16] or from regulatory standards implementing those objectives.[17] One standard may at first

12. *See* AS 46.40.094 (2002) (amended 2003).

13. Office of Coastal Management, State of Alaska & Office of Coastal Zone Management, U.S. Dep't of Commerce, State of Alaska Coastal Management Program and Final Environmental Impact Statement (1979).

14. AS 46.40.210 (1995) thus defines a "use of direct and significant impact" as a

use, or an activity associated with the use, which proximately contributes to a material change or alteration in the natural or social characteristics of a part of the state's coastal area and in which (A) the use, or activity associated with it, would have a net adverse effect on the quality of the resources of the coastal area; (B) the use, or activity associated with it, would limit the range of alternative uses of the resources of the coastal area; or (C) the use would, of itself, constitute a tolerable change or alteration of the resources within the coastal area but which, cumulatively, would have an adverse effect.

15. The definition of "use of direct and significant impact" set out in AS 46.40.210 applies under

the ACMP in various circumstances, as, for example, in determining which coastal districts should comment on a project, AS 46.40.096; when a proposed project should be submitted to voters, AS 46.40.160; when state agencies should keep coastal management districts informed of projects, 6 AAC 50.040 (2000); whether to send out public notice for a project, 6 AAC 50.070 (am.5/20/93); and when to diverge from initial coastal boundaries, 6 AAC 85.040(c)(1) (am.8/18/79). But Alaska's statutes and regulations do not employ the phrase "use of direct and significant impact" in any particular context that would require a formal discussion of cumulative impacts in an ACMP consistency determination.

16. *See* AS 46.40.020.

17. *See, e.g.*, 6 AAC 80.040(b) (coastal development standard); 6 AAC 80.050 (geophysical hazards standard); 6 AAC 80.070 (energy facilities standard); 6 AAC 80.110 (mining and mineral processing standard); 6 AAC 80.120 (subsistence standard); 6 AAC 80.130 (habitat standard); 6 AAC 80.140 (air, land, and water quality standard).

glance seem to require a NEPA-like cumulative impacts analysis: 6 AAC 80.040's coastal development standard provides that "[t]he placement of structures and the discharge of dredged or fill material into coastal water must, at a minimum, comply with the standards contained in Parts 320–323, 33 C.F.R. (Vol. 42 of the Federal Register, pp. 37133–47 (July 19, 1977))."[18] The federal regulation referred to in this provision requires a formal cumulative impacts analysis.[19] But the activities covered by these two regulations—construction and discharge in coastal waters—require federal permitting; the requirement of a federal permit, in turn, ensures that the minimum level of compliance required under Alaska's coastal development standard will be achieved upon approval of a federal permit. We thus find no reasonable basis for construing Alaska's regulatory standard to require a separate layer of cumulative impacts analysis as part of DGC's consistency review process.[20]

To be sure, we have previously emphasized that Alaska's ACMP standards are "extremely protective of the environment."[21] We have thus recognized that the ACMP's standards require the consistency review process to consider a project's known and predictable effects. For example, the standards require projects to be managed and designed to ensure resource protection,[22] sometimes to the maximum extent feasible and prudent.[23] Some standards expressly contemplate consideration of adjacent uses;[24] one even explicitly refers to consideration of "subsequent adjacent uses," and so directly calls for a

**18.** 6 AAC 80.040(b) (2000).

**19.** 33 C.F.R. § 320.4(a) (2002) states, in relevant part:

The following policies shall be applicable to the review of all applications for [Corps'] permits. Additional policies specifically applicable to certain types of activities are identified in 33 C.F.R. Parts 321–324.

(a) Public Interest Review.

(1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.... All factors which may be relevant to the proposal must be considered including the cumulative effects thereof....

The current provision has been amended but, in terms of the cumulative impacts requirement, remains identical to § 320.4(a) (1977), the provision referred to in 6 AAC 80.040(b). *See* General Regulatory Policies, 42 Fed.Reg. 37,133, 37,136 (July 19, 1977) (codified as amended at 33 C.F.R. pt. 320).

**20.** Our recent decision in *Cook Inlet Keeper v. State, Office of Mgmt. & Budget,* 46 P.3d 957 (Alaska 2002) strengthens this conclusion by confirming that federally permitted activities cannot properly be omitted from ACMP consistency review as being outside the scope of a project merely because those activities have already been federally permitted. *Id.* at 962–63. By making it clear that the federally permitted activity remains within the scope of a project's ACMP review process, *Cook Inlet Keeper* ensures that, in making its ACMP consistency determination, DGC will review and consider any cumulative impacts analysis prepared by a federal agency under 33 C.F.R. § 320.4(a). In conducting its own review, of course, DGC remains free to accept or reject the federal cumulative impacts

analysis. But given the availability of the federal analysis to DGC, we see no need to create a second tier of formal cumulative impacts review. Cf. *Kachemak Bay Conservation Soc'y v. State, Dep't of Natural Res.,* 6 P.3d 270, 290 (Alaska 2000) (holding state did not have to perform same level of analysis as federal environmental impact statement).

**21.** *Trustees for Alaska v. State, Dep't of Natural Res.,* 851 P.2d 1340, 1344 (Alaska 1993) (citing *Hammond v. North Slope Borough,* 645 P.2d 750, 761 (Alaska 1982)).

**22.** 6 AAC 80.050 (2000) (requiring that geophysical hazards be taken into account in "siting, design"); 6 AAC 80.070(b) (requiring siting of energy facilities to "consider the concurrent use," and "select sites" to fulfill various factors); 6 AAC 80.110(a) (directing that mining and mineral processing be "regulated, designed"); 6 AAC 80.120(a) (addressing subsistence issues, with language such as "recognize and assure," "designate areas"); 6 AAC 80.130(b), (d) (requiring that habitats be "managed").

**23.** 6 AAC 80.070(b) (energy facilities); 6 AAC 80.130(d) (habitats); *see also* 6 AAC 80.110(b) (mining and mineral processing).

"Feasible and prudent" is defined as "consistent with sound engineering practice and not causing environmental, social, or economic problems that outweigh the public benefit to be derived from compliance with the standard which is modified by the term 'feasible and prudent.' " 6 AAC 80.900(a)(20).

**24.** 6 AAC 80.070(b)(2) (energy facilities); 6 AAC 80.070(b)(7) (same); 6 AAC 80.110(a) (mining and mineral processing).

look into the future.[25]

But these references to consideration of a project's broader effects hardly suggest that the ACMP review process incorporates NEPA's rigorous definition of cumulative impacts or its requirement of a formal cumulative impacts analysis. To the contrary, they seem more compatible with BP's suggestion that Alaska law simply folds certain features of the federal law's rigorous, multi-project approach to cumulative impacts analysis into a less formal and somewhat narrower approach that uses a "whole-project analysis." This approach considers cumulative effects as an integral part of the consistency review process, not as an independent criterion requiring separate analysis; it takes into account "all aspects of a project, considered as a whole" and its "existing development context"; but it does not require DGC to speculate about unknown and unpredictable future events.

Greenpeace points to this court's case law as an alternative source of its proposed cumulative impacts analysis requirement. But our cases require nothing more than the kind of "whole-project" approach that BP and the DGC advocate.[26] We have usually discussed cumulative impacts as they relate to phased projects—projects divided into discrete developmental phases and subjected to a new ACMP consistency review as each successive phase of development approaches.[27] In this procedural context, our discussion of cumulative impacts analysis has primarily focused on the need to look beyond a project's current phase so that the overall consistency of the entire project does not elude examination.[28]

The legislature addressed this issue in 1994 by enacting AS 46.40.094, which sets out substantive requirements and procedural guidelines for phased ACMP consistency review.[29] As we recently held in *Kachemak Bay Conservation Society v. State, Department of Natural Resources,* the 1994 enactment requires discussion of cumulative impacts at each level of phased consistency review, but it limits the required scope of analysis for future developments and events to a consideration of information that is known by DGC or brought to its attention.[30] Our decision in *Kachemak Bay* thus confirms the relatively modest role that our earlier case law assigned to cumulative impacts analysis: DGC need only assess available information to take a hard look at a project's overall impacts, including known and readily foreseeable future impacts.[31]

**25.** 6 AAC 80.070(b)(2).

**26.** Relatedly, Greenpeace cites an opinion issued by the Attorney General in 1982 advising that the ACMP "requires consideration of cumulative impacts." Ops. Atty Gen. File No. J-66-502-81 (7/16/82). But the Attorney General's opinions do not have precedential effect, and the opinion at issue here is entitled to minimal persuasive weight: it was issued shortly after the ACMP's adoption, cites no authority to support its position on cumulative impacts, and fails to explain the nature and scope of the cumulative impacts analysis that the act is supposed to require.

**27.** *E.g., Thane Neighborhood Ass'n v. City & Borough of Juneau,* 922 P.2d 901 (Alaska 1996), *superseded in part by statute as stated in Kachemak Bay Conservation Soc'y,* 6 P.3d at 276–79. *But see Trustees for Alaska v. State, Dep't of Natural Res.,* 851 P.2d 1340, 1344 (Alaska 1993) (noting that state agency's delay of specific findings of geophysical hazards "means that particularized geophysical hazards will be considered on a lease-site-by-lease-site basis").

**28.** *See, e.g., Trustees for Alaska v. State, Dep't of Natural Res.,* 851 P.2d 1340, 1347 (Alaska 1993);

*see also Trustees for Alaska v. Gorsuch,* 835 P.2d 1239, 1245–46 (Alaska 1992) (agency must consider "the probable cumulative impact of all anticipated activities which will be a part of a 'surface coal mining operation,'" whether or not the activities are part of the permit under review"); *cf. Kachemak Bay Conservation Soc'y,* 6 P.3d at 276 (discussing our prior phasing cases in light of AS 46.40.094, a 1994 enactment expressly allowing phased consistency review in certain categories of cases).

**29.** *See* AS 46.40.094.

**30.** 6 P.3d at 278–79.

**31.** As already noted, *see* note 20 above, our most recent case on the topic, *Cook Inlet Keeper v. State, Office of Mgmt. & Budget,* 46 P.3d 957 (Alaska 2002), does not expand this role, focusing on the need for a realistic appraisal of available information concerning the whole of a project and its overall effects, including surrounding circumstances and known and readily foreseeable future impacts, but drawing the line at speculative inquiry into the possible consequences of unpredictable future developments.

Greenpeace argues, though, that the federal Coastal Zone Management Act (CZMA), its Reauthorization Amendments of 1990, and actions by DGC in promoting cumulative impacts analysis under the ACMP support a NEPA-like formal cumulative analysis requirement. But these arguments are unavailing. Congress undeniably passed the CZMA to address concerns about the potential environmental impacts of future coastal development.[32] The CZMA offers incentives to encourage states to manage their coastal areas by making determinations of the balance between development and conservation.[33] Once a state receives program approval, it may request grants to improve its program; the federal government may suspend further funding or, as a last resort, withdraw program approval for noncompliance with a grant's terms.[34] Alaska promulgated the ACMP and submitted it for program approval under the CZMA. In its most recent review, Alaska was found to be in compliance with the CZMA.[35]

Greenpeace cites no provision in the CZMA or in regulations enacted under the act's authority that requires Alaska to adopt NEPA-defined cumulative impacts analysis.[36] And we are aware of no relevant provision of this kind.[37] Greenpeace separately argues that the CZMA's purposes mandate analysis of cumulative impacts.[38] But at most, the act's statement of purposes merely encourages states to consider cumulative impacts. Greenpeace similarly points to DGC handbooks and federal grant applications, arguing that the agency itself has effectively adopted a policy of conducting rigorous cumulative impacts analysis. But the cited materials adopt no clear policy: they simply encourage coastal districts to develop cumulative impacts analysis guidelines, or outline DGC's hopes—still unrealized—to adopt regulations providing more definite cumulative impacts guidelines.

Last, Greenpeace advances a cursory argument that a NEPA-like cumulative impacts analysis requirement can be inferred from various sections of article VIII of the Alaska Constitution [39] and from the "public trust" responsibility implicit in those provisions.[40] Yet none of these sources directly or indirectly suggests the need for such an analysis.

■■■ In summary, as we recently observed in *Kachemak Bay*, " 'analyses comparable to those generally required by [NEPA] for the preparation of an environmental impact statement . . . are not required,' " in an ACMP consistency determination.[41] Thus, if

32. 16 U.S.C. §§ 1451, 1452 (2000).

33. *See* Martin J. LaLonde, Note, *Allocating the Burden of Proof to Effectuate the Preservation and Federalism Goals of the Coastal Zone Management Act,* 92 Mich. L.Rev. 438, 439, 462–63, 466–70 (1993).

34. 16 U.S.C. § 1454 (requiring submittal for approval); § 1458(c) (addressing suspension of funding), (d) (providing for withdrawal of approval).

35. Evaluation of State Coastal Management Programs and National Estuarine Research Reserves, 64 Fed.Reg. 17,624, April 12, 1999 (stating that Alaska was "found to be implementing and enforcing" its program, "addressing the national coastal management objectives identified in [16 U.S.C. § 1452(2)(A)-(K)], and adhering to the programmatic terms of their financial assistance awards").

36. Greenpeace cites two federal regulations that are inapposite. One gives states *discretion* to consider cumulative impacts "[i]n identifying uses and their appropriate management," and urges that states *"should* consider potential individual and cumulative impacts of uses on coastal waters." 15 C.F.R. § 923.11(b) (2002) (emphasis added). The other simply requires *applicants* for consistency review to include information addressing cumulative impacts criteria. 15 C.F.R. § 930.58(a)(3).

37. *Cf.* 16 U.S.C. § 1455(d) (listing requirements of state management programs).

38. *See, e.g.,* 16 U.S.C. § 1452(1), (2)(A), (2)(B), (2)(C), (6).

39. Greenpeace mentions Alaska Constitution, article VIII, sections 1, 3, 4, 6, 8, 13, 14, 16, and 17 but fails to set out any meaningful discussion of their language or its contextual significance.

40. Greenpeace cites *Owsichek v. State, Guide Licensing & Control Board,* 763 P.2d 488, 493 (Alaska 1988), and cursorily claims that its " 'public trust' approach to management of the State's resources cannot be effectuated without an analysis of cumulative impacts such as Northstar."

41. 6 P.3d at 278, 290 n. 37 (quoting with approval the Alaska Legislature's findings in Ch. 38, § 1(7), SLA 1994).

DGC's final consistency determination fails in its consideration of the Northstar Project's cumulative impacts, its failure does not reflect a lack of compliance with mandatory ACMP procedures for cumulative impacts analysis; instead, the flaw would lie in failing to take a hard look at the issue and failing to render a reasoned decision—a flaw that would be subject to challenge only under the deferential standard that we commonly apply in administrative appeals challenging DGC's substantive findings.[42] Because Greenpeace chose not to claim a breach of this "hard-look" standard as a point on appeal—raising only the narrow procedural question of whether DGC violated the ACMP as a matter of law by failing to conduct a formal cumulative impacts analysis—we decline to consider whether DGC's ruling would pass muster under the more deferential test.[43]

**C. Phasing**

Greenpeace similarly frames its second point on appeal exclusively as a legal issue, arguing that DGC erred as a matter of law by improperly phasing its review of the Northstar Project; specifically, Greenpeace complains that illegal phasing occurred because DGC improperly issued certain permits prematurely, thereby allowing work on the project to begin before the consistency review was completed, and because DGC also approved "major aspects" of Northstar's future development without sufficient information to make a reasoned ACMP consistency determination.

In response, DGC and BP deny that the Northstar Project was phased, maintaining that DGC's consistency review encompassed the Northstar Project in its entirety. This response is persuasive.

---

**42.** *See, e.g., Kachemak Bay Conservation Soc'y*, 6 P.3d at 275; *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1210 (Alaska 1996); *Trustees for Alaska v. State, Dep't of Natural Res.*, 851 P.2d 1340, 1347 (Alaska 1993).

**43.** In its reply brief, Greenpeace *does* argue the issue of DGC's compliance with the "hard-look" standard, contending that, even under DGC's and BP's proposed "whole-project" approach to cumulative impacts analysis, "a review of the record confirms DGC's failure to consider the incremental contribution of Northstar, in the context of past, present and reasonably foreseeable actions and renders the DGC decision arbitrary and capricious." Greenpeace implies that its new argument on this issue is properly raised in its reply brief because it responds to new arguments that DGC and BP assertedly raised in responding to Greenpeace's opening brief. According to Greenpeace, DGC's and BP's proposed "whole-project" approach and their claim that DGC actually used this approach in reviewing the Northstar Project amount to "new positions" that DGC and BP "never presented to the superior court." Below, Greenpeace asserts, DGC and BP simply insisted that, under Alaska law, no cumulative impacts analysis was needed.

But Greenpeace mischaracterizes the record. The record establishes that DGC's and BP's current positions on the cumulative impacts issue are substantially identical to the ones they asserted and briefed before the superior court. In describing its consideration of the Northstar Project's impacts under the ACMP's energy facilities standard, for example, DGC argued in its superior court brief:

> The [consistency] evaluation considers other activities as necessary to determine project consistency with the standard. However, nei-

ther this provision nor any other ACMP or district program standard mandates an analysis of the cumulative impacts of a proposed project in conjunction with other development activities. Rather, the standards address the consistency of the *project* under review. The requirement to evaluate the Northstar Project for consistency with ACMP is fulfilled by an evaluation of the project against each standard as exemplified above.

BP's superior court brief argued the same theory:

> Greenpeace's broad theory of cumulative impacts analysis is not authorized by any statute, regulation, agency practice, case, or constitutional provision. Rather, the statutes, regulations, agency practice, and Alaska decisional law all reach a different conclusion: DGC must evaluate the total impacts of the project it is reviewing, but not of any other undefined development projects. As the discussion below indicates, DGC unquestionably did conduct a thorough review of all aspects of the Northstar Project. This court should reject Greenpeace's allegation that DGC's analysis was inadequate because it failed to consider the cumulative impacts of the Northstar Project together with other projects.

Apart from the fact that DGC's and BP's current briefs explicitly call this "whole-project" approach a cumulative impacts analysis, their briefing of the point is virtually indistinguishable from their positions below. It thus appears to us that Greenpeace—not DGC or BP—is the party advancing a new position and that it waived its right to raise its new claim of error by failing to include the issue as a point on appeal or to argue it in its opening brief. *Tenala, Ltd. v. Fowler*, 921 P.2d 1114, 1124 (Alaska 1996).

A short but complete answer to Greenpeace's claim of improper phasing is that the Northstar Project simply was not phased. As previously mentioned, phased ACMP review is now governed by the provisions of AS 46.40.094. DGC did not purport to conduct its consistency review under this phasing statute. To the contrary, although BP requested phased consideration, DGC ruled that Northstar did not qualify for phasing under AS 46.40.094 and expressly undertook to review the complete Northstar Project.

Tacitly acknowledging this fact, Greenpeace nevertheless attempts to portray DGC's consistency review as *"de facto* improper phasing." But this portrayal sweeps too broadly. It attempts to mask as a simple procedural issue of law a point that actually would challenge the merits of a complex, technical, and fact-intensive administrative decision enforcing standards rooted in agency expertise and discretion. This is precisely the kind of administrative decision that we may review only under the deferential "hard-look" standard. Because Greenpeace restricts its appeal on this point to its contention that DGC's review amounted to improper phasing as a matter of law, it is enough for present purposes to reject this claim as unfounded. We decline to reach the broader issue that Greenpeace failed to preserve: whether DGC's consistency determination could withstand deferential scrutiny under the "hard-look" standard of review.

## IV. CONCLUSION

Because the ACMP does not require a rigorous, NEPA-like cumulative impacts analysis and Northstar's consistency review was not improperly phased, we AFFIRM the state's final consistency determination.