*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DENALI CITIZENS COUNCIL, | ) | |
| | ) | Supreme Court No. S-14896 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-12552 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF NATURAL | ) | |
| RESOURCES, and USIBELLI COAL | ) | |
| MINE, INC., | ) | |
| | ) | No. 6865 – February 14, 2014 |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Peter Van Tuyn and Karen E. Schmidt, Bessenyey & Van Tuyn, L.L.C., Anchorage, for Appellant. Rebecca Kruse, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee Department of Natural Resources. David J. Mayberry and Kyle W. Parker, Crowell & Moring L.L.P., Anchorage, for Appellee Usibelli Coal Mine, Inc.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I. INTRODUCTION

This is an administrative appeal from a decision by the Department of Natural Resources (DNR) to grant Usibelli Coal Mine (Usibelli) a gas exploration license in the Healy Basin (the Healy license). Denali Citizens Council (Denali Citizens), a community-based public interest group located in the Denali Borough, challenges DNR's finding that issuing the license is in the best interests of the state on two grounds: first, that DNR failed to take a "hard look" at the economic feasibility of excluding certain residential areas and wildlife habitat from the license; and second, that DNR's treatment of environmental mitigation measures in the best interest finding was arbitrary and capricious.

We affirm the superior court's order upholding DNR's decision to issue the gas exploration license to Usibelli because we conclude that DNR did not act arbitrarily in developing and publishing its best interest finding.

## II. FACTS AND PROCEEDINGS

### A. Statutory Background

Alaska Statute 38.05.132 authorizes the Commissioner of the Department of Natural Resources (the commissioner) to issue "exploration licenses" to individuals or corporations seeking to discover oil or gas on state land.[1] Such a license gives the holder the exclusive right to explore the land described in the license for oil or gas deposits for up to ten years,[2] as well as an option to convert the exploration license into a lease if the licensee satisfies certain requirements.[3]

---

[1]    AS 38.05.132(a).

[2]    AS 38.05.132(b)(1).

[3]    AS 38.05.132(b)(2).

In considering a proposal for an exploration license, the Director of the Division of Oil and Gas (the director) is required to make a written finding that issuing the exploration license will be in the best interests of the state (a best interest finding or BIF).[4] Prior to publishing a final best interest finding (final finding or final BIF) and approving a license proposal, the director must make a preliminary best interest finding (preliminary finding or preliminary BIF) available to the public and provide an opportunity for public comment.[5] The final written finding, issued after the close of the comment period, must contain a summary of public comments received by DNR and the director's responses to those comments.[6]

The written finding must set out "the basis for the director's preliminary or final finding . . . that, on balance, leasing the area would be in the state's best interest."[7] At a minimum, the director must "consider and discuss" two categories of "facts": first, facts that are "material to issues that were raised during" the public comment period and "within the scope" of the finding, as determined by the director; and, second, facts material to ten specified matters, including "the reasonably foreseeable fiscal effects of

---

[4]  AS 38.05.133(f). Although the statute assigns this responsibility to the commissioner, the commissioner delegated this duty to the director with respect to the Healy license.

[5]  AS 38.05.035(e)(5).

[6]  AS 38.05.035(e)(7).

[7]  AS 38.05.035(g)(2). The legislature has determined that it is "in the best interests of the state . . . to encourage an assessment of its oil and gas resources" so as to "minimize the adverse impact of exploration, development, production, and transportation activity"; and "to offer acreage for oil and gas leases or for gas only leases." AS 38.05.180(a)(2).

the lease sale and the subsequent activity" and "lease stipulations and mitigation measures."[8]

Any person who participated in the public comment process by submitting a written comment and who is "aggrieved" by the final BIF may file a request for

---

[8]     AS 38.05.035(g)(1). The director must also consider and discuss

(i)     property descriptions and locations;

(ii)    the petroleum potential of the sale area, in general terms;

(iii)   fish and wildlife species and their habitats in the area;

(iv)    the current and projected uses in the area, including uses and value of fish and wildlife;

(v)     the governmental powers to regulate the exploration, development, production, and transportation of oil and gas or of gas only;

(vi)    the reasonably foreseeable cumulative effects of exploration, development, production, and transportation for oil and gas or for gas only on the sale area, including effects on subsistence uses, fish and wildlife habitat and populations and their uses, and historic and cultural resources;

. . . .

(viii)  the method or methods most likely to be used to transport oil or gas from the lease sale area, and the advantages, disadvantages, and relative risks of each; [and]

. . . .

(x)     the reasonably foreseeable effects of exploration, development, production, and transportation involving oil and gas or gas only on municipalities and communities within or adjacent to the lease sale area . . . .

AS 38.05.035(g)(1)(B).

4                                                                 6865

reconsideration of the finding with the commissioner.[9] An adverse decision on reconsideration may then be appealed to the superior court.[10] Points on appeal in the superior court are limited to those presented to the commissioner in the request for reconsideration.[11] The party seeking judicial review of a best interest finding has the burden of proving that the finding is invalid.[12]

### B.     Facts

Usibelli submitted a gas-only exploration license proposal to DNR in April 2004. The proposal covered 208,630 acres in the Healy area, including land west of the Nenana River and adjacent to Denali National Park.

In November 2004, DNR provided notice of its intent to evaluate the proposal and sought public comment in January 2005. Denali Citizens, a "non-profit citizens group . . . with a mission of supporting sound planning and sustainable development in the Denali Borough," responded. It noted that the license included residential areas and the wildlife-rich Wolf Townships[13] area west of the Nenana River, and asked DNR to consider excluding some of these areas from the license. Denali Citizens also requested that DNR address noise mitigation and facility siting in its best interest finding.

In August 2005, DNR issued a "Preliminary Best Interest Finding" concluding that issuing the Healy license would be in the best interests of the state. The

---

[9]     AS 38.05.035(i).

[10]     AS 38.05.035(*l*).

[11]     *Id.*

[12]     AS 38.05.035(m).

[13]     The "Wolf Townships" are located near the northeast corner of Denali National Park and are surrounded by park lands. The Denali Caribou Herd uses the Wolf Townships as an overwintering ground.

preliminary finding addressed the reasonably foreseeable effects of the proposed license, including statewide and local fiscal effects and cumulative effects on the area's fish and wildlife.[14] It also described proposed measures "to mitigate the potential adverse social and environmental effects of specific license related activities." These mitigation measures included specific standards addressing noise, such as a noise monitoring plan requirement and maximum ambient noise limits, as well as restrictions on the siting of exploration equipment, such as a minimum setback requirement. Usibelli would also be required to obtain the consent of every landowner in a residential subdivision before constructing drill pads or compressor stations on any plot within that subdivision.

However, the director would have discretion to grant exceptions to these mitigation measures

> upon a showing by the licensee that compliance with the mitigation measures is not feasible or prudent, or that the licensee will undertake an equal or better alternative to satisfy the intent of the mitigation measure.

The preliminary finding defines "[f]easible and prudent" as "consistent with sound engineering practice and not causing environmental, social, or economic costs that outweigh the public benefit to be derived from compliance with the standard."

Upon issuing the preliminary finding, DNR provided public notice, sought public comment, and conducted two public meetings during the comment period. Denali Citizens submitted comments in response to the preliminary finding, asserting that the finding failed to address its concerns about the scope of the proposed license area and that the proposed mitigation measures were inadequate. It again requested that DNR exclude sensitive areas west of the Nenana River from the license.

---

[14] *See* AS 38.05.035(g)(1)(B) (listing matters that must be addressed in a preliminary finding).

In June 2010, DNR issued a final best interest finding, concluding that it was in the state's best interests to issue the exploration license. The final finding did not remove any acreage from the license proposal. In response to Denali Citizens' request that areas west of the Nenana River be excluded from the license, DNR wrote:

> Removing the area west of the Nenana River from the license area may make the project economically unfeasible. The imposition of mitigation measures to avoid, minimize, or mitigate potential impacts is preferable to removing a large acreage from the license area. As specific projects are proposed, additional mitigation measures may be imposed. Given these measures, license advisories, and existing laws and regulations, removing the area west of the Nenana River from the license area is unnecessary.

With respect to specific concerns regarding the Wolf Townships, DNR noted that the Wolf Townships are not part of Denali National Park and that mitigation measures would provide adequate protection for wildlife in the area.

The final finding also modified several mitigation measures. DNR substantially revised the noise standards, removing the noise monitoring plan requirement and the maximum ambient noise limits prescribed in the preliminary finding. The final BIF provided that "[m]easures to be used to mitigate potential noise impacts associated with facilities and compressor stations will be considered on a site-specific basis." DNR also eliminated the requirement that Usibelli obtain consent from all surface property owners within a residential subdivision before constructing any drill pads or compressor stations in the subdivision. The setback requirements remained largely the same.[15] Finally, DNR modified the blanket exception to mitigation measures:

---

[15]    The preliminary finding required setbacks from residential structures of at least 500 feet for drill pads and at least 1,500 feet for compressor stations. The final finding expanded the application of these setback requirements to "community or institutional building[s]."

the final finding allowed for exceptions to mitigation measures "upon a showing by the licensee that compliance with the mitigation measure is not practicable." The final BIF defines "[p]racticable" as "feasible in light of overall project purposes after considering cost, existing technology, and logistics of compliance with the mitigation measures."

Denali Citizens filed a request for reconsideration of the final BIF with the commissioner. The commissioner granted the request and affirmed. With respect to Denali Citizens' objection to the decision not to exclude the area west of the Nenana River from the license, the commissioner determined that mitigation measures adequately addressed concerns about facility siting, the protection of wildlife and habitat, and conflicts with recreational activities. The commissioner also noted, in response to Denali Citizens' observation that the Wolf Townships had been classified as widlife habitat and public recreation land in the Tanana Basin Area Plan (the Plan),[16] that the Plan allows oil and gas leasing throughout the license area.

With respect to Denali Citizens' claim that mitigation measures had been weakened or eliminated in the final finding, the commissioner wrote that

> The intent of changes to the mitigation measures concerning noise and buffers around residential areas was not to weaken protections, but to ensure flexibility while not unnecessarily restricting the licensee's activities. Specifically disallowing drill pads and compressor stations in subdivisions and stipulating specific noise thresholds may be unnecessarily restrictive, especially when lots are unoccupied or

---

[16] The Tanana Area Basin Plan, adopted pursuant to AS 38.04.065, "determines major land uses on state lands within the planning area, describes management intent, and sets management guidelines for various resources" in the Tanana Basin Planning Area. *See* Tanana Basin Area Plan, 1-5, *available at* http://dnr.alaska.gov/mlw/planning/areaplans/tanana/pdf/ch_1.pdf. The town of Healy and other lands covered by the proposed exploration license are included in the Planning Area. *See id.* at 1-3 to 1-4. The Wolf Townships are included in Subunit 4E1, the Stampede Trail Management Unit.

undeveloped, perhaps for long periods of time. Requiring the consent of all property owners in a subdivision could result in drill pads and compressor stations not being allowed in subdivisions at all.

The commissioner also asserted that the mitigation measures in the final finding were "stronger, more protective, and more detailed than mitigation measures for most other [state gas leases or licenses]."

Denali Citizens appealed DNR's decision to the superior court, and the court affirmed. The court concluded that DNR had a reasonable basis to grant Usibelli the exploration license without reducing its size because: (1) the license area was within the parameters established by statute;[17] (2) the license area was consistent with the exploration licensing statute's purpose, that is, to encourage exploration in areas with low or unknown potential; and (3) given this purpose, it was reasonable for DNR to conclude that a larger license area subject to mitigation measures was more consistent with the state's best interests than a smaller license area.[18] With respect to mitigation measures, the court held that it was premature to consider the adequacy of the measures imposed in the final finding. Alternatively, the court concluded that the proposed mitigation measures were not arbitrary. This appeal followed.

---

[17] AS 38.05.132(c)(2) (providing that exploration license area must be between 10,000 and 500,000 acres and "must be reasonably compact and contiguous").

[18] *See* AS 38.05.180(a)(2) (It is "in the best interests of the state . . . to encourage an assessment of its oil and gas resources" so as to "minimize the adverse impact of exploration, development, production, and transportation activity"; and "to offer acreage for oil and gas leases or for gas only leases.").

## III. STANDARD OF REVIEW

In an administrative appeal, we "independently review the merits of the underlying administrative decision."[19] When an agency decision, such as a best interests finding, involves "administrative expertise as to either complex subject matter or fundamental policy formulations," the reviewing court need only determine whether the decision had a "reasonable basis."[20] Under this standard, the BIF will survive judicial review so long as it is not "arbitrary, capricious, or unreasonable."[21] Although this is a deferential standard, the reviewing court must "ensure that DNR has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making,"[22] and that the best interest finding includes a discussion of all the important factors DNR considered.[23]

---

[19] *State, Dep't of Health & Soc. Servs. v. N. Star Hosp.*, 280 P.3d 575, 579 (Alaska 2012) (internal citation and quotation marks omitted).

[20] *Hammond v. N. Slope Borough*, 645 P.2d 750, 758 (Alaska 1982); *see also Kachemak Bay Conservation Soc'y. v. State, Dep't of Natural Res.*, 6 P.3d 270, 275-76 (Alaska 2000) (*Kachemak Bay*).

[21] *Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1213 (Alaska 1996).

[22] *Kachemak Bay,* 6 P.3d at 275 (internal quotation marks omitted).

[23] *Trs. for Alaska v. State, Dep't of Natural Res.*, 795 P.2d 805, 811 (Alaska 1990) (*Camden Bay I*).

## IV. DISCUSSION

Denali Citizens challenges the Healy BIF on two grounds.[24] First, it argues that DNR inadequately addressed the economic feasibility of reducing the size of the Healy license. Second, it argues that DNR's treatment of mitigation measures in the final BIF was arbitrary and capricious.

### A. DNR Was Not Required To Consider The Economic Feasibility Of Removing The Area West Of The Nenana River From The Healy License.

Denali Citizens first argues that the BIF inadequately addressed the economic feasibility of reducing the size of the license. Despite concluding that it must consider the economic feasibility of Usibelli's license proposal in the best interest finding, DNR merely asserted, without analysis, that reducing the size of the license might "make the project economically unfeasible." Therefore, Denali Citizens concludes, the agency failed to take a "hard look" at what it itself acknowledged is a salient issue.

As the commissioner wrote in his response to Denali Citizens' request for reconsideration, the economic feasibility of a license proposal is relevant to one of the factors DNR is required to discuss under AS 38.05.035(g), "the reasonably foreseeable fiscal effects of the [license sale] and the subsequent activity on the state and affected municipalities and communities." Many of the economic consequences of granting a license will not obtain if the project is not feasible and does not occur. Therefore, the director is required to consider the economic feasibility of the license proposal in order to predict accurately the "reasonably foreseeable fiscal effects" of the license sale.

---

[24] Denali Citizens' Statement of Points on Appeal alludes to a third argument based on Article VIII of the Alaska Constitution, but it does not develop this argument in its brief. This constitutional claim is, accordingly, waived. *Great Divide Ins. Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 n.10 (Alaska 2003) ("Points that are inadequately briefed are considered waived.").

But Denali Citizens does not fault DNR for its discussion of the economic feasibility of the license as proposed. Rather, Denali Citizens argues that DNR's BIF is arbitrary and capricious because it fails to give adequate treatment to the economic feasibility of the Healy project *if the area west of the Nenana River were excluded from the license*. But there is no basis for Denali Citizens' assertion that the director is required to address this separate issue. Consideration of the economic feasibility of the license *as proposed* simply does not require consideration of the feasibility of alternatives to the proposal. Nor do the "foreseeable fiscal effects" of the Healy license *as proposed* depend on the economic feasibility of reducing the size of the license. Therefore, Denali Citizens' assertion that DNR did not "actually analyze whether limiting the license area applied for by Usibelli actually would make the project infeasible," even if accurate, is irrelevant.

**B.      DNR's Treatment Of Mitigation Measures Was Not Arbitrary.**

Denali Citizens advances two distinct arguments challenging DNR's treatment of mitigation measures: first, that DNR did not adequately explain its decision to relax mitigation measures in its final finding; and second, that the mitigation measures imposed in the final finding are inconsistent with the Tanana Basin Area Plan.

**1.      Denali Citizens' challenge to DNR's treatment of mitigation measures is ripe.**

The superior court concluded that Denali Citizens' challenge to the BIF's treatment of mitigation measures was not ripe. The court cited our opinion in *Trustees for Alaska v. State, Department of Natural Resources* (*Camden Bay II*)[25] for the proposition that a challenge to mitigation measures is not ripe at the BIF stage, since DNR cannot be expected to evaluate the efficacy of "mitigation measures even before

---

[25]      851 P.2d 1340, 1346-47 (Alaska 1993).

knowing which activities it needs to mitigate."[26]

In *Camden Bay II*, we rejected the argument that a "detailed" assessment of mitigation measures was necessary for DNR to make a finding, at the leasing stage, that issuing a lease would be consistent with the Alaska Coastal Management Plan (ACMP).[27] But this court did not hold that DNR had no obligation to consider potential mitigation measures in making that finding. On the contrary, the *Camden Bay II* court relied in part on the fact that "DNR's mitigation measures provide sensible guidelines to minimize the harmful effects of oil and gas development" in holding that DNR's consistency determination was reasonable.[28] In other words, while DNR is not required to provide a detailed analysis of mitigation measures in a best interest finding, it may be arbitrary and capricious to conclude that issuing a lease or license is in the best interests of the state if the director has not identified adequate measures to reduce impacts on conflicting uses.[29]

Moreover, Denali Citizens is challenging the process by which DNR

---

[26]    *Id.* at 1347; *see also* AS 38.05.035(h) ("In preparing a written finding . . . , the director may not be required to speculate about possible future effects subject to future permitting that cannot reasonably be determined until the project or proposed use for which a written best interest finding is required is more specifically defined . . . .").

[27]    851 P.2d at 1347.

[28]    *Id.*

[29]    *See Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1212 (Alaska 1996) (finding that DNR's determination that a project is consistent with the ACMP was reasonable where DNR "prescribed general mitigation measures at the lease sale stage to ensure that these activities do not interfere with other water-dependent and water-related uses . . . ."); *see also* AS 38.05.035(g)(1)(B) (DNR must discuss "lease stipulations and mitigation measures" in a BIF); AS 38.05.180(a)(2)(A)(ii) (It is in the best interests of the state to "minimize the adverse impact of exploration, development, production, and transportation activity.").

determined that the mitigation measures proposed in the final BIF are in the best interests of the state rather than the adequacy of the mitigation measures themselves. In addition to reaching reasonable conclusions, DNR must engage in a reasonable decision-making process while preparing a best interest finding.[30] Even if it were true that a challenge to the substantive adequacy of DNR's proposed mitigation measures is premature, Denali Citizens' challenge to DNR's decision-making process is certainly ripe at this stage.[31]

In conclusion, it was error to conclude that Denali Citizens' challenge to DNR's proposed mitigation measures was not ripe. But because the superior court held, in the alternative, that DNR's treatment of mitigation measures was not arbitrary, we will address the merits of Denali Citizens' argument as well.

>    **2.    DNR adequately explained its decision to change mitigation measures in the final best interest finding.**

Denali Citizens first challenges DNR's treatment of mitigation measures on the grounds that DNR failed adequately to explain its decision to adopt more relaxed mitigation measures in its final BIF.

It is well-established in administrative law that when an agency departs from a prior policy, it must give "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[32] Although the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy

---

[30]    Under Alaska law, agencies must give "reasoned discretion to all the material facts and issues," *Camden Bay I*, 795 P.2d 805, 811 (Alaska 1990), and "engage[] in reasoned decision making." *Kachemak Bay*, 6 P.3d 270, 275 (Alaska 2000). These requirements speak more to the reasonableness of the agency's decision-making process than to the reasonableness of its final decision.

[31]    *Cf. Kachemak Bay*, 6 P.3d at 275-76.

[32]    *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983).

are *better* than the reasons for the old one," it must "display awareness that it *is* changing position" and "may not . . . depart from a prior policy *sub silentio*."[33] Importantly, "the law does not require the explanation to be exhaustive."[34]

The final BIF excluded several mitigation measures that were included in the preliminary BIF. In particular, it eliminated a requirement that Usibelli obtain the consent of all the surface property owners in a residential subdivision before constructing facilities within that subdivision and replaced specific noise restrictions with a commitment to consider such restrictions "on a site-specific basis."

On reconsideration, the commissioner explained that

> The intent of changes to the mitigation measures concerning noise and buffers around residential areas was not to weaken protections, but to ensure flexibility while not unnecessarily restricting the licensee's activities. Specifically disallowing drill pads and compressor stations in subdivisions and stipulating specific noise thresholds may be unnecessarily restrictive, especially when lots are unoccupied and undeveloped, perhaps for long periods of time. Requiring the consent of all property owners in a subdivision could result in drill pads and compressor stations not being allowed in subdivisions at all.

Denali Citizens alleges that this explanation "is unsupported by any analysis" and lacks a basis in the record. However, reasonable basis review is deferential, and DNR's explanation for its change of course need not be exhaustive.[35] To ask for an in-depth treatment of every conceivable sub-issue, as Denali Citizens

---

[33] *Fox*, 556 U.S. at 515; *see also Arkema, Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010).

[34] *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1035 (9th Cir. 2010).

[35] *See Kachemak Bay*, 6 P.3d at 292-93 (Although "DNR's analyses are not exhaustive," they are sufficient to show that DNR considered the relevant issues.); *see also Modesto Irrigation Dist.*, 619 F.3d at 1035.

suggests, would be to require something much more than simply "reasoned decision making." Therefore, we conclude that the commissioner's explanation for DNR's decision to eliminate the specific noise and subdivision mitigation measures was adequate.

The final BIF also adopted a different standard for granting exceptions to mitigation measures, providing that exceptions "will only be granted upon a showing by the licensee that compliance with the mitigation measure is not practicable" rather than upon a showing that compliance is "not feasible or prudent."[36] Denali Citizens argues that the former standard is significantly more permissive than the latter and that DNR did not adequately explain this change.

There is substantial support for Denali Citizens' assertion that the "not feasible or prudent" standard is different from the "not practicable standard." First, DNR defines the two terms differently. "Feasible and prudent" is defined as "consistent with sound engineering practice and not causing environmental, social, or economic costs that outweigh the public benefit to be derived from compliance with the standard." "Practicable," by contrast, is defined as "feasible in light of overall project purposes after considering cost, existing technology, and logistics of compliance with the mitigation measures." The former standard appears to require the licensee to show that the *public* benefits of implementing the mitigation measure outweigh the *public* ("environmental, social, or economic") costs, while the latter standard only appears to require the licensee to demonstrate that the *private* costs of the measure to the licensee are too high.

---

[36] Denali Citizens did not ask the commissioner to reconsider this blanket exception in its request for reconsideration of the final BIF. But the State has not asserted that this omission restricts our consideration of this issue. *See generally* AS 38.05.035(*l*).

Second, Usibelli submitted a comment on the preliminary BIF asserting that the standards for exceptions for certain mitigation measures did not permit DNR to take into account economic considerations. In response, DNR wrote that

> [e]xceptions may be granted if it is not practicable to comply with the standard. The final finding uses the term practicable instead of "feasible or prudent." Practicable means feasible in light of overall project purposes after considering cost, existing technology, and logistics of compliance with the mitigation measure.

It is difficult to understand how this explanation is responsive to Usibelli's comment if the new standard does not permit greater consideration of its costs.

However, both Usibelli and DNR maintained at oral argument that the revision to the blanket exception was merely cosmetic and that the new standard is no less stringent than the old. We are satisfied that as long as the "not practicable" standard is applied so as to be no more permissive than the "not feasible or prudent" standard,[37] there will have been no substantive change to the blanket exception and, therefore, no requirement that DNR provide a reasonable explanation. In view of DNR's commitment to apply these standards identically, we need not address whether DNR provided an adequate explanation for the change in the wording of the blanket exception.

C.   **The Best Interest Finding Is Consistent With The Tanana Basin Area Plan**.

Denali Citizens also claims that the BIF is arbitrary and capricious because it is inconsistent with the Tanana Basin Area Plan. Denali Citizens maintains that because the Stampede Trail Management Unit — which overlaps with the section of the license adjacent to Denali National Park — is primarily classified as public recreation

---

[37]   For example, if the "not feasible or prudent" standard only permits DNR to weigh the *public* costs of implementing a mitigation measure, DNR may not rely on language in its definition of "practicable" to justify the consideration of costs *to Usibelli*.

17   **6865**

and wildlife habitat land, oil and gas development as a "secondary use" may be permitted in Stampede Trail only "when its occurrence will not adversely affect achieving the objectives for the primary uses."[38]  The Plan also provides that "[i]mpacts on caribou from [oil and gas] exploration and development will be avoided or mitigated, especially during the calving season" and that  "[s]pecific measures [to mitigate impacts] will be determined in the leasing process."  Denali Citizens argues that DNR's failure both to protect the "primary" uses of Stampede Trail through adequate mitigation measures and to identify "[s]pecific measures" to protect caribou rendered its best interest finding arbitrary.

We note initially that neither the Alaska Statutes nor DNR regulations indicate that a regional land use plan is legally binding on the Department.[39]  To the contrary, in a case holding that a land use plan is not a regulation, we expressed doubt that the provisions of such a plan are enforceable against DNR.[40]

However, even if the Plan is legally binding, the best interest finding is fully consistent with its provisions.  First, contrary to Denali Citizens' representations, the Plan does not classify oil and gas development as a disfavored "secondary use" within Stampede Trail.  Rather, the Plan emphasizes that state land in Stampede Trail is

---

[38]  TANANA BASIN AREA PLAN 1-5 (1990), *available at* http://dnr.alaska.gov/mlw/planning/areaplans/tanana/pdf/ch_1.pdf.

[39]  *See* AS 38.04.065, 11 Alaska Administrative Code 55.010-.280 (2005).

[40]  *See State, Dep't of Natural Res. v. Nondalton Tribal Council*, 268 P.3d 293, 304 n.93 (Alaska 2012) ("[A]lthough it guides future DNR policy, the [Bristol Bay Area Plan] is likely not enforceable by the public against DNR either." (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67-72 (2004))).

"open to mineral entry."[41] Therefore, oil and gas development is generally permitted within the Stampede Trail Management Unit.

Second, although the Plan does call for the identification of "[s]pecific measures" to protect the local caribou herd, such measures are to be identified in the "*leasing* process," not the *licensing* process.[42] Although Denali Citizens maintains that licensing and leasing are identical for purposes of the Plan, the statute creating the exploration license program makes clear that they are not.[43] Therefore, DNR is not required to identify specific mitigation measures to protect caribou at this juncture.[44]

## V. CONCLUSION

We AFFIRM the superior court's order upholding the decision of the Department of Natural Resources.

---

[41]  TANANA BASIN AREA PLAN 3-132 (1990), *available at* http://dnr.alaska.gov/mlw/planning/areaplans/tanana/pdf/sub4e.pdf ("[M]ineral entry, coal prospecting, and leasing will be allowed . . . . This unit is open to mineral entry . . . . This unit is available for oil, gas, and coal leasing . . . .").

[42]  *Id.*

[43]  AS 38.05.132(b)(2) (An exploration license gives the licensee "the option to convert the exploration license for all or part of the state land . . . into an oil and gas *lease* . . . upon fulfillment of the work commitments contained in the exploration license.") (emphasis added).

[44]  Moreover, far from ignoring impacts on caribou, the BIF provides that "[t]he director . . . may impose seasonal restrictions on activities located in, or requiring travel through or overflight of, important moose and caribou calving and wintering areas."