*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ORUTSARARMIUT NATIVE COUNCIL, CHEVAK NATIVE VILLAGE, NATIVE VILLAGE OF EEK, NATIVE VILLAGE OF KWIGILLINGOK, and COOK INLETKEEPER, | ) ) ) ) ) ) ) |
| Appellants, | ) |
| v. | ) ) |
| JOHN BOYLE in an official capacity as Commissioner of the Department of Natural Resources; DONLIN GOLD, LLC; and CALISTA CORPORATION, | ) ) ) ) ) ) |
| Appellees. | ) ) ) |

Supreme Court Nos. S-18737/18888 (Consolidated)

Superior Court No. 3AN-21-07684 CI

O P I N I O N

No. 7794 – November 14, 2025

| | |
|---|---|
| ORUTSARARMIUT NATIVE COUNCIL and NATIVE VILLAGE OF EEK, | ) ) ) ) |
| Appellants, | ) ) |
| v. | ) ) |
| JOHN BOYLE an official capacity as Commissioner of the Department of Natural Resources, STATE OF ALASKA, DEPARTMENT OF NATURAL RESOURCES; DONLIN | ) ) ) ) ) ) |

Superior Court No. 3AN-22-06374 CI

GOLD, LLC; and CALISTA
CORPORATION,

　　　　　　　　Appellees.

Appeal in File No. 18737 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge. Appeal in File No. 18888 from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Olivia Glasscock and Katharine S. Glover, Earthjustice, Juneau, for Appellants Orutsararmiut Native Council, Chevak Native Village, Native Village of Eek, Native Village of Kwigillingok, and Cook Inletkeeper. Eric B. Fjelstad, Elena M. Romerdahl, and James N. Leik, Perkins Coie LLP, Anchorage, for Appellee Donlin Gold, LLC. Emily A. Feenstra, Assistant Attorney General, Anchorage, David A. Wilkinson, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee John Boyle. David A. Wilkinson, Senior Assistant Attorney General, Anchorage, Dana S. Burke, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska. Matthew Singer, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Appellee Calista Corporation. Kevin Cuddy and Whitney A. Brown, Stoel Rives LLP, Anchorage, for Amicus Curiae Alaska Oil and Gas Association. Jonathan W. Katchen, Holland & Hart LLP, Anchorage, for Amicus Curiae ANCSA Regional Association.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.

# I.     INTRODUCTION

The Donlin mine prospect sits on lands owned by Alaska Native Corporations in the Kuskokwim River watershed.  The mine's developer sought various permits necessary to construct and operate the mine, including (1) a right-of-way lease across adjoining state-owned lands to build a natural gas pipeline running from Cook Inlet to the mine site and (2) permits to divert and appropriate waters to dry out the mining pit and use water for mining operations.  The Department of Natural Resources approved these permits in separate administrative processes over objections by local tribes.

The tribes argue that the permit approvals were contrary to both statute and article VIII of the Alaska constitution, which requires resources belonging to the State to be developed consistent with the public interest.[1]  Because the Department considered only the impacts of the permitted activities themselves — building the pipeline and appropriating the waters — the tribes argue that the Department was required to consider the cumulative impacts of the entire Donlin mine proposal when considering whether the permitted activities are in the public interest.  We are not persuaded by the tribes' argument.

Neither the statute governing rights-of-way for pipelines nor the statute governing water appropriations required the Department to consider the downstream effects of mining activity made possible by the permitted activities.  Those downstream effects are evaluated and regulated under other statutory frameworks, such as those for reclamation of lands used for mining and for discharge of pollutants into state waters.

Nor did article VIII of the constitution require the Department to consider the costs and benefits of the Donlin mine as a whole before deciding whether to grant the pipeline and water appropriation permits.  The tribes rely on our precedent requiring

---

[1]     Alaska Const. art. VIII, §§ 1-2.

the Department to consider the cumulative impacts of a proposed use of state resources, a duty that serves the constitutional mandate that resources belonging to the State be used "for the maximum benefit of its people."[2] We described the duty to consider cumulative impacts as "whole project analysis."[3] But unlike the project in that case, which entailed the development of state minerals on state lands, the Donlin mine entails extraction of privately owned minerals on privately owned lands. Because these are private resources, rather than state resources, the Department was not required to consider the cumulative impacts of their development when deciding whether to allow the use of state waters and access over state lands to develop the mine. The constitutionally required analysis is focused on the costs and benefits of developing state resources — in this case, constructing the pipeline on state lands and appropriating state waters — not on the costs and benefits of developing private resources. Therefore, the Department was not required to consider the cumulative impacts of the mining activity at the heart of the Donlin mine proposal when granting the challenged permits.

Because we reject the tribes' arguments that the Department's permitting decisions were statutorily and constitutionally deficient, we affirm its decisions.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Donlin Gold, LLC (Donlin) seeks to develop an open pit gold mine in the Kuskokwim River watershed. The mine is subject to permitting and oversight by multiple federal and state agencies. Pursuant to the National Environmental Policy Act (NEPA),[4] a Final Environmental Impact Statement (EIS) was prepared for the project, with the Army Corps of Engineers as the lead agency. The voluminous EIS, parts of

---

[2]     *Sullivan v. Resisting Env't Destruction on Indigenous Lands* (*REDOIL*), 311 P.3d 625, 635 (Alaska 2013) (quoting Alaska Const. art. VIII, § 2).

[3]     *Id.* at 637.

[4]     42 U.S.C. §§ 4321-4370m–12.

which are contained in the record of these appeals, describes many of the key facts and proposals.

According to the EIS, the project entails three main components: the mine itself, a pipeline to supply fuel for mine operations, and a transportation corridor to deliver supplies to and ship ore from the mine.

The proposed mine site sits on lands owned primarily by two Alaska Native Corporations created pursuant to the Alaska Native Claims Settlement Act (ANCSA):[5] The Kuskokwim Corporation, a village corporation, and Calista Corporation (Calista), a regional corporation. Consistent with ANCSA's terms, Calista owns the subsurface mineral rights. These lands are part of the Kuskokwim River watershed, which is of great cultural importance to Alaska Native communities that have resided in the Yukon-Kuskokwim region for millennia. The Kuskokwim and its tributaries are also of vital importance to local tribes for subsistence, social, economic, and spiritual purposes.

According to Donlin's plans, mining will initially occur in two neighboring open pits, which will eventually merge into a single pit approximately 1.9 miles long, 1.2 miles wide, and 1,310 feet deep at its deepest point. Surface waters will be impounded and diverted, and groundwaters pumped, in order to dewater the mine site, allowing for safe construction of the pit. Waste rock will be stored at an upstream facility and in the pit itself. A tailings storage facility will be built south of the mine and will include a lined tailings dam, a fully-lined impoundment, two temporary freshwater diversion dams, and a downstream seepage recovery system. Overburden will temporarily be stored at the project site for use in reclamation activities at closure.

---

[5]     43 U.S.C. §§ 1601-1629h.

And four water-retaining dams will be constructed to meet the plant's need for water to process the ore and to manage contact water[6] across the site.

The mine will take three to four years to construct and will operate for about 27 years. It is predicted to produce around 556 million short tons of ore and 30 million ounces of gold.

After mining operations end in one of the open pits during year 22 of the operation, a lake will form. When active dewatering of the pit stops, the pit will fill with precipitation, runoff, and groundwater. Mining operations will end in the second pit two years later, and mine operation will continue on stockpiled ore for an additional two years. Then, according to Donlin's plan, the pit will receive water from the tailings storage facility over a 52-year period. If left uncontrolled, these waters will eventually overtop the lake and discharge into nearby Crooked Creek. Because water in the pit will not meet water quality standards, the waters will have to be treated in perpetuity by an on-site plant before being discharged downstream.

Donlin proposes to power the mine with natural gas. It plans to construct a natural gas pipeline running approximately 315 miles from Cook Inlet, through the Alaska Range, to the mine site. The pipeline will be a contract carrier that can supply gas to other users through a contracting process. The pipeline project will include five permanent components: "the pipeline, one compressor station, one metering station, and two pig launching and receiving facilities."[7] During construction, the pipeline

---

[6] Contact water is "surface water or groundwater that has contacted mining infrastructure," according to the EIS.

[7] "Pigging" is the practice of cleaning or inspecting pipelines by inserting a device known as a "pig" into a pipeline from a launching facility and forcing the device through the pipeline to a receiving facility "to clean debris and accumulated liquids, to conduct inspections, and to remove residual product from the pipeline between product transfer operations." *Pipeline Pig Launching and Receiving*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (Mar. 17, 2025), https://www.epa.gov/ natural-gas-star-program/pipeline-pig-launching-and-receiving.

project will also require a number of temporary facilities, including barge landings, airstrips, campsites, equipment storage, and access roads. The pipeline will largely be buried, except for two sections near active faults. The pipeline will cross nearly 600 streams between Cook Inlet and its terminus. Roughly 207 miles of pipeline will be built on state land. The remainder will cross federal and Alaska Native Corporation land.

To construct and supply the mine, Donlin proposes to barge materials up the Kuskokwim River. This plan entails increased barge traffic on the river, construction of a new port, a 30-mile access road from the port to the proposed mine site, and expanded barge facilities in Bethel and fuel terminals in Dutch Harbor.

To carry out these plans, Donlin had to obtain many state permits in addition to the federal permits that triggered the EIS. The state permits Donlin has sought include the following: permits for general stormwater discharges, integrated waste management, a pollutant discharge elimination system, and certifying reasonable assurance under section 401 of the Clean Water Act from the Department of Environmental Conservation;[8] fish habitat permits from the Department of Fish and Game; and reclamation plan approval, a pipeline right-of-way lease, and a series of water rights permits from the Department. It is the water rights permits and pipeline right-of-way permits that gave rise to these appeals.

---

[8]    Section 401 of the Clean Water Act requires states to provide a water quality certification before a permit can be issued for activities that may result in discharge into navigable waters. *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 707 (1994) (citing 33 U.S.C. § 1341). This requires a finding that there is a reasonable assurance that the activity will be conducted in accordance with applicable water quality standards. *Id.* at 712.

## B. Proceedings

### 1. The water use permits

Donlin applied to the Department for 11 water rights permits in May 2013 and for a 12th in September 2016. Among other water uses, the permits authorize dewatering the mining pit, water use for the tailings storage facility (including for wells and impoundments), and contact dams. According to Donlin's application, dewatering the pit will help stabilize the pit walls and permit efficient mining.

The Department granted the 12 permits in April 2021. Applying the statutory criteria in the Water Use Act, which require consideration of the economic, public health, and environmental effects of the water appropriations,[9] the Department found the appropriations to be in the public interest. The Department considered that the Donlin mine would be a "[b]enefit to the applicant resulting from the proposed appropriation" and would provide local and statewide economic benefits. The Department also considered effects of the proposed appropriation of water, concluding that the reduced streamflow would not adversely affect fish and game resources or public recreation opportunities and that appropriating water was unlikely to harm local residents or affect public health, other water use, or access to navigable water.

Orutsararmiut Native Council (ONC), Chevak Native Village, Chuloonawick Native Village, Native Village of Eek, Kasigluk Traditional Council, and Tuluksak Native Community appealed the grant of the permits to the Commissioner. They argued that granting the permits was not in the public interest and that the agency had violated article VIII of the Alaska Constitution by "failing to consider the effects of the proposed mine as a whole." Donlin responded to the appeal, arguing that the permits were lawful.

---

[9] AS 46.15.010–.270; AS 46.15.080(a)(4) ("The commissioner shall issue a permit if the commissioner finds that . . . the proposed appropriation is in the public interest."); AS 46.15.080(b) (setting forth statutory factors Commissioner must consider in determining public interest).

The Commissioner denied the appeal, concluding that the Department was not required to consider the cumulative impacts of the entire mine and that the Department reasonably and appropriately evaluated the Water Use Act's public interest factors. The Commissioner reasoned that the Water Use Act did not require consideration of the effects "from building and operating the mine" and instead required only "an analysis based on the proposed appropriation."

ONC and Native Village of Eek appealed the Commissioner's decision to the superior court. They argued that the Department's decision to approve the water rights permits violated the Water Use Act because it failed to consider the pit lake, which they described as "an inevitable and unavoidable component" of the Donlin Gold Project, "as part of the analysis" when deciding whether granting the permits was in the public interest. ONC and Native Village of Eek also again argued that the Department violated article VIII by failing to consider the cumulative impacts of the whole project, including those of the Donlin mine, when approving the permits. They cited our decision in *Sullivan v. Resisting Environmental Destruction on Indigenous Lands* (*REDOIL*).[10]  In *REDOIL* we stated that article VIII requires the State to consider the "cumulative impacts" of a project, which we described as "tak[ing] into account all aspects of a project, considered as a whole and its existing development context."[11]

The superior court affirmed the Department's decision. The court ruled that the Department "was not required to conduct a cumulative impacts analysis that took into account the entirety of the mine project" and did not violate the Water Use Act by granting the permits. The court reasoned that the Donlin mine was not the "whole project" as the term was used in *REDOIL* because the development of the

---

[10]    311 P.3d 625 (Alaska 2013).

[11]    *Id.* at 635, 637 (quoting *Greenpeace, Inc. v. State, Off. of Mgmt. and Budget, Div. of Governmental Coordination*, 79 P.3d 591, 596 (Alaska 2003)).

Donlin mine, though supported by state water appropriations, would impact exclusively private resources.

## 2. The pipeline right-of-way lease

In April 2014 Donlin submitted an application to the Department for a pipeline right-of-way lease. The application sought permission to use state lands for the construction and operation of a pipeline "to transport natural gas for operational use at the Donlin Gold mine site."

In accordance with the Right-of-Way Leasing Act (ROWLA), the Department gave public notice of the application and an opportunity to comment.[12] The Department also held public hearings on Donlin's application. After issuing a preliminary decision in 2019, the Commissioner approved Donlin's application in 2020.

Cook Inletkeeper, on behalf of itself and ONC, Susitna River Coalition, Kasigluk Traditional Council, and Tununak IRA Council submitted a request for reconsideration. They argued that the Department had to consider the negative impacts of the "entire project" to determine whether the lease was in the public interest. The Commissioner initially denied the request for reconsideration.

ONC, Chevak Native Village, Chuloonawick Native Village, Native Village of Eek, and Cook Inletkeeper appealed the decision to the superior court. The Commissioner then retroactively granted the request for reconsideration, indicating that the Department would conduct a further analysis of the cumulative and reasonably foreseeable impacts of the right-of-way lease for the pipeline and issue a new decision. After issuing a preliminary revised decision and receiving additional comments, the Commissioner issued a revised decision once again granting Donlin's right-of-way lease application. The Commissioner noted that although the agency has "a duty to consider cumulative impacts as a project evolves through its phases, the Donlin Gold

---

[12] *See* AS 38.25.010–.260; AS 38.35.070 (providing that Commissioner shall publish notice of application for right-of-way lease).

Mine is not a phase of the Donlin Pipeline" because the pipeline is merely "an associated action."

ONC, Chevak Native Village, Native Village of Eek, Native Village of Kwigillingok, and Cook Inletkeeper appealed the revised final decision to the superior court. Donlin, participating as an appellee, argued that ONC lacked standing to bring the appeal because it failed to file a timely objection to the lease application, as required by ROWLA.[13] Calista was permitted to intervene.

The superior court affirmed the Department's decision. The court first rejected the argument that ONC lacked standing to appeal the Department's decision. It then affirmed the Department's decision to grant Donlin the right-of-way lease. It rejected ONC's argument that article VIII required the Department to consider the impacts caused by the Donlin mine when deciding whether to grant a right-of-way lease for the pipeline, reasoning that the Donlin mine was not part of the "whole project" for purposes of the lease application.

### 3.    Appeals

ONC, Chevak Native Village, Native Village of Eek, Native Village of Kwigillingok, and Cook Inletkeeper appealed the superior court decision in the pipeline case. ONC and Native Village of Eek appealed the superior court decision in the water rights case.[14] Each case was briefed and argued separately.[15] We now consolidate the cases for purposes of decision.

---

[13]    *See* AS 38.35.200(a) ("An applicant or competing applicant or a person who has a direct financial interest affected by the lease who raises objections within 60 days of the publication of notice under AS 38.35.070 are the only persons with standing to seek judicial review of a decision of the commissioner under AS 38.35.100.").

[14]    We refer to the appellants from both the pipeline case and water rights case appeals collectively as ONC for the remainder of this opinion.

[15]    Amicus briefs were filed by the ANCSA Regional Association in both cases and by the Alaska Oil and Gas Association in the pipeline case. We thank both amici curiae for their helpful briefing.

## III.   DISCUSSION

ONC challenges the Department's decisions to issue the pipeline right-of-way lease and the water use permits on both statutory and constitutional grounds. ONC argues that ROWLA required the Department to consider the impacts of the mining that will be powered by gas carried by the pipeline in deciding whether the pipeline is in the public interest.  Similarly, ONC argues that the Water Use Act required the Department to consider the impacts of the pit lake that will result from the mining activity enabled by the appropriation and diversion of waters in deciding whether those appropriations serve the public interest.  ONC also argues that article VIII of the Alaska Constitution required the Department to consider the cumulative impacts of the entire Donlin mine before issuing both the lease and the permits.

### A.   ROWLA Did Not Require The Department To Consider The Impacts Of Mining Activity When Deciding Whether To Approve The Pipeline That Would Transport Gas Used By The Mine.

ONC argues that the Department should have examined the impacts of the Donlin mine before granting the pipeline right-of-way.  According to ONC, references in ROWLA to end users of gas carried by pipeline indicate that the impacts of mining activity by the Donlin mine, the end user of the proposed pipeline's gas, must be considered in deciding whether a pipeline is in the public interest and should be approved.  But we see no such intent in the statutory text.

Whether the public interest analysis required by ROWLA extends to impacts of activities by users of gas transported by pipeline is a question of statutory interpretation.  When we review an agency's interpretation of statute, there are two possible standards of review.  If interpretation of the statute involves " 'agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions,' we evaluate 'whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's

ultimate determination.' "[16]  But if "statutory interpretation does not involve agency expertise, or the agency's specialized knowledge and experience would not be particularly probative," we substitute our independent judgment.[17]

This question of statutory interpretation does not involve agency expertise or policy determinations that have been delegated to the agency to decide.  Although the Department asserts that we should review its decision for reasonable basis, it does not explain why its expertise or authority to make fundamental policy decisions is implicated here.  Rather, this question implicates legislative intent:  did the legislature intend pipeline approvals to be based on consideration of the effects of the pipeline itself and the pipeline operator's fitness, or of the various effects of downstream gas users?  Therefore, we apply our independent judgment.

When using our independent judgment, our goal is to "give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[18]  "We begin with the text and its plain meaning" and interpret the language using a "sliding-scale approach."[19]  "[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be" to overcome the text's plain meaning.[20]

---

[16]  *N. Slope Borough v. State*, 484 P.3d 106, 113 (Alaska 2021) (quoting *Nicolos v. N. Slope Borough*, 424 P.3d 318, 325 (Alaska 2018)).

[17]  *Alaska Pub. Offs. Comm'n v. Patrick*, 494 P.3d 53, 56 (Alaska 2021) (quoting *Eberhart v. Alaska Pub. Offs. Comm'n*, 426 P.3d 890, 894 (Alaska 2018)).

[18]  *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1234 (Alaska 2003)).

[19]  *Id.*

[20]  *Id.* (alteration in original) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

ROWLA establishes a process for building pipelines across lands owned by the State. A person seeking to build a pipeline must apply for a noncompetitive right-of-way lease of state land.[21] To approve such a lease, the Department must determine whether the person is "fit, willing, and able to perform the transportation or other acts proposed in a manner that will be required by the present or future public interest."[22] This determination requires the Department to consider certain factors:

> (1) whether "the proposed use of the right-of-way will unreasonably conflict with existing uses of the land involving a superior public interest;"

> (2) whether the applicant has the requisite "technical and financial capability to protect state and private property interests;"

> (3) whether the applicant has the capability, "to the extent reasonably practical," to take action to "prevent any significant adverse environmental impact," "undertake any necessary restoration or revegetation" and "protect the interests of individuals living in the general area of the right-of-way who rely on fish, wildlife, and biotic resources of the area for subsistence purposes;"

> (4) whether "the applicant has the financial capability to pay reasonably foreseeable damages for which the applicant may become liable;"

> (5) and whether, in the construction and operation of the pipeline, the applicant agrees to comply with applicable laws and regulations regarding hiring state residents.[23]

These factors address only the impacts of construction and operation of the pipeline itself. None can be reasonably read to require the Department to consider the downstream effects of industrial activities by users of gas transported by the pipeline. ROWLA does not regulate or address such activities; a right-of-way lease

---

[21]    AS 38.35.050(a).

[22]    AS 38.35.100(a).

[23]    AS 38.35.100(a).

includes only "a leasehold interest in state land for pipeline right-of-way purposes to a person and authorizing the construction or operation of, or the transportation, service, or sale by, a pipeline for crude oil, natural gas, carbon dioxide, or products."[24] Accordingly, the scope of the Department's approval process extends only to the applicant's ability to perform the acts of construction, transportation, and maintenance required to transport gas by pipeline.

ONC finds support for its position in ROWLA's legislative policy statement. In enacting ROWLA the legislature declared:

> The natural resources of this state in crude oil and natural gas and in its land for transportation of these resources and their products by pipeline toward markets both in and out of the state are capable of making a significant contribution to the general welfare of the people of this state. It is the policy of this state that the development, use, and control of a pipeline transportation system be directed to make the maximum contribution to the development of the human resources of this state, the increase in the standard of living for all of its residents, the advancement of existing and potential sectors of its economy, the strengthening of free competition in its private enterprise system, and the careful protection of its incomparable natural environment.[25]

ONC argues that considering "the effects, positive and negative, of a proposed pipeline's market — in this case, a massive gold mining project — is essential to carrying out these policies." But we see no legislative intent for the Department to consider the benefits and drawbacks of particular end users of pipeline gas when deciding whether a pipeline is in the public interest. Rather, we read the legislative declaration to reflect a judgment that building pipelines to bring the State's oil and gas

---

[24]    Former AS 38.35.230(3) (2018). The relevant ROWLA definitions have been renumbered since this dispute arose. We cite to the statutory definitions as numbered when the events relevant to this dispute occurred, prior to the 2024 renumbering.

[25]    AS 38.35.010(a).

to market, both to sell and to power economic growth, is generally in the public interest, and that it is legislative policy that such pipelines shall be built in ways that protect Alaska's environment. There is no inkling that the legislature intended the ROWLA process to be the forum for evaluating the merits of industrial projects that ultimately use the oil and gas to be transported.

ONC also suggests that because ROWLA's definition of "transportation" references a "downstream terminus,"[26] the impacts of end users of pipeline gas must be considered in evaluating whether the pipeline is in the public interest. Again, we are not persuaded. This definition merely indicates that evaluation of the applicant's fitness, under the statutory factors described in AS 38.35.100(a), must include activities and effects extending all the way to the point where gas is delivered to the end user.[27] But it does not encompass the industrial facilities and activities of end users themselves.

In sum, the Department did not err in limiting analysis of the impacts of the pipeline to the pipeline itself, rather than also considering the effects of the mining that would be powered by gas transported by the pipeline.

**B.** **The Department Was Not Required To Consider The Impacts Of The Pit Lake When Deciding Whether To Approve The Water Use Permits.**

According to ONC, the Department violated the Water Use Act "[b]y refusing to consider the effects of the inevitable pit lake on the public interest" when

---

[26] Former AS 38.35.230(10) (2018).

[27] *See* former AS 38.35.230(10) (2018) (defining "transportation" to mean "the shipment or carriage by a pipeline of crude oil, natural gas, or products from an upstream terminus . . . to a downstream terminus in one or more points for delivery of the minerals to a purchaser or consignee"); former AS 38.35.230(7) (2018) (defining "pipeline" to mean "all the facilities of a total system of pipe . . . used by a carrier for transportation of crude oil, natural gas, or products for delivery" and includes, among other things, "all pipe, pump or compressor stations, station equipment, . . . access roads, . . . terminals and terminal facilities, . . . and all other facilities used or necessary for an integral line of pipe, taken as a whole, to effectuate transportation").

issuing the 12 water rights permits.  ONC argues that the Water Use Act's public interest analysis must extend to "all known and reasonably possible effects of the appropriations."  Because the pit lake is the planned and inevitable result of the mining activity made possible by the water appropriations, ONC asserts that the Department violated the Water Use Act and acted arbitrarily by failing to consider the pit lake.  The Department, Donlin, and Calista all argue that public interest analysis under the Water Use Act is limited to the effects of the appropriation of water itself.

These arguments require us to interpret the Water Rights Act, to which we apply our independent judgment.[28]  The Department argues that "it is fundamentally a matter of policy and science whether any of the myriad effects within the umbrella of the underlying development . . . can be traced to the water appropriations themselves."  We agree that, as a factual matter, whether a particular environmental impact can be traced to an appropriation of water requires the application of technical expertise possessed by the Department.  But ONC's argument is not about factual cause and effect.  It concerns whether the legislature intended the Department to consider the environmental impacts of activities facilitated or made possible by proposed water appropriations.  This question is one of policy, but there is no indication that it is one the legislature delegated to the Department to decide.  Rather, whether the Water Rights Act's public interest review concerns only the environmental effects of the appropriations themselves, or also the environmental effects of activities for which the appropriations are used, is a question the legislature itself has answered with the statute's own terms.  Therefore, we interpret the statute using our independent judgment, considering text and legislative history in an effort to discern the legislature's intent.[29]  Our approach to the standard of review in this case is consistent with our

---

[28]      *See Alaska Pub. Offs. Comm'n v. Patrick*, 494 P.3d 53, 56 (Alaska 2021).

[29]      *See State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019).

decision in *Tulkisarmute Native Community Council v. Heinze*, where we held that "interpreting the applicable statutory requirements for granting a permit extension does not involve agency expertise."[30]

To evaluate ONC's argument, it is necessary to consider the relationship between the challenged water appropriations and the pit lake. The water use permits authorize the dewatering of the pit, damming and withdrawal for dust control, fire suppression, provision of potable water, diversion, and other activities to be conducted at and around the mine site and its related facilities. According to the Department's decision, the water uses authorized for diversion and back pump systems are to "avoid mine contact water and remain in compliance with the Clean Water Act." The Water Resources Section also determined that the proposed uses will benefit the mining and milling processes.

When active mining ceases in the first of the two neighboring pits after an estimated 22 years, Donlin will stop actively dewatering that mining pit. At that point in time, that pit will begin to fill with precipitation, runoff, and groundwater, and the entire pit from both mines areas will later receive water from the tailings storage facility over a 52-year period. Eventually, if left uncontrolled, the water level of the pit lake will rise high enough that water will spill over into the adjacent Crooked Creek watershed. Pumping will be required in perpetuity to ensure the lake's water levels do not overtop its banks. This is because the water will have high levels of heavy metals due to contact with mining waste, and will have to be treated in perpetuity to protect downstream lands, waters, fish and wildlife, and people.

Importantly, the appropriation and diversion of water that the challenged permits allow are necessary for the mining activities that Donlin plans. But the permits themselves do not authorize the creation of the pit lake. ONC argues, however, that

---

[30]    898 P.2d 935, 940 (Alaska 1995).

because the pit lake is an inevitable downstream consequence of the mining activities made possible by proposed water appropriations, the Department should have considered the impacts of the pit lake when deciding whether to allow the water appropriations.

The text of the Water Use Act describes what the Department must consider when deciding whether to approve an application. Under AS 46.15.080(a), the Commissioner shall issue a permit for the proposed appropriation if the Commissioner finds that:

> (1) rights of a prior appropriator will not be unduly affected;
> (2) the proposed means of diversion or construction are adequate;
> (3) the proposed use of water is beneficial; and
> (4) the proposed appropriation is in the public interest.

To determine whether the proposed appropriation is in the "public interest," the Act describes factors that the Commissioner must consider:

> (1) the benefit to the applicant resulting from the proposed appropriation;
> (2) the effect of the economic activity resulting from the proposed appropriation;
> (3) the effect on fish and game resources and on public recreational opportunities;
> (4) the effect on public health;
> (5) the effect of loss of alternate uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation;
> (6) harm to other persons resulting from the proposed appropriation;
> (7) the intent and ability of the applicant to complete the appropriation; and
> (8) the effect upon access to navigable or public water.[31]

---

31      AS 46.15.080(b).

Some of the factors are phrased in a way that suggests the Department must consider downstream effects of the appropriations beyond those effects from removing the water. Factors one and two require the Department to consider the benefit and economic activity "resulting from the proposed appropriation." Though multiple interpretations are possible, the phrase "resulting from" seems to suggest the Department should consider not only the effects of the appropriation itself, but also of the activity for which the appropriation is used. Indeed, an appropriation of water is unlikely to have much benefit or economic effect on its own. Only when put to some use is the appropriation beneficial.

By contrast, factors three and four, which require the Department to consider the effect on fish and wildlife, recreational uses, and public health, do not include the phrase "resulting from," suggesting perhaps that the legislature did not intend the same downstream consideration. "[W]e presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' "[32] This textual distinction arguably supports the Department's position that when considering the latter factors, the Department is to consider the effects of the appropriation itself, rather than the effects of activities facilitated by the appropriation. That is, the language of the Water Use Act suggests that the Department must consider the effects of removing waters from the source on fish, wildlife, recreation, and public health: for example, the impacts of lower water flows on salmon spawning and rearing areas, the availability of drinking water for downstream communities, the potential drying out of waterfowl and moose habitat.

---

[32] *Williams Alaska Petrol., Inc. v. State*, 529 P.3d 1160, 1181 (Alaska 2023), *cert. denied,* 144 S. Ct. 555 (2024) (quoting *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999)).

This interpretation is further supported by factors five and eight, which require the Department to consider, respectively, "the effect of loss of alternate uses of water that might be made within a reasonable time if not precluded or hindered by the proposed appropriation" and "the effect upon access to navigable or public water."[33] Both of these factors use "the effect" without the more extended "resulting from the proposed appropriation" language. And both factors are most naturally read as limiting the Department's consideration to actual appropriation of water. For instance, the effect of loss of alternate uses of water references the direct tradeoffs in the use of the appropriated water for one purpose and not another. Similarly, the effect of access to navigable or public water references the risk that appropriating waters from a stream will reduce the volume of water in a way detrimental to access and navigability.

What creates some uncertainty is factor six, which requires the Department to consider "harm to other persons resulting from the proposed appropriation."[34] Because this factor uses the "resulting from" language, suggesting a more extended causal chain, it may contemplate harms caused by activities supported by the appropriation. To the extent this is so, it seems unlikely the legislature intended this factor to sweep so broadly as to include the environmental effects of the pit lake in this case. To interpret this factor so broadly as to include the kinds of environmental impacts on fish, wildlife, and public health that ONC highlights would not only make factors three and four superfluous, but also negate the limited sweep indicated in the text of those statutory factors. Such an interpretation would therefore run counter to our rules of construction.

Because the text of the Water Use Act itself does not conclusively resolve the dispute over its scope, we look to other statutes that directly regulate the mining

---

[33] AS 46.15.080(b)(5), (8).

[34] AS 46.15.080(b)(6).

-21-                                                                              **7794**

activities that will create the pit lake. We "consider collectively statutes addressing common subject matter, reading them as a whole in order that a total scheme evolves which maintains the integrity of each act and avoids ignoring one or the other."[35]

The pit lake Donlin proposes to create is regulated by the mining reclamation statutes.[36] For mining on either state or private lands, a miner "may not engage in a mining operation until the commissioner has approved a reclamation plan for the mining operation."[37] The reclamation statutes provide that "[a] mining operation shall be conducted in a manner that prevents unnecessary and undue degradation of land and water resources, and the mining operation shall be reclaimed as contemporaneously as practicable with the mining operation to leave the site in a stable condition."[38]

Reclamation plans must conform to regulations adopted by the Commissioner.[39] These regulations impose standards for reclamation of surface lands, requiring miners to prevent discharge of acid rock drainage and take other measures to restore the mine site.[40] The miner's reclamation plan must include measures "for reclamation of tailings impoundments, settling ponds, reservoirs, heaps, open pits and

---

[35] *City of Valdez v. Prince William Sound Oil Spill Response Corp.*, 548 P.3d 616, 625 (Alaska 2024) (quoting *State v. Strane*, 61 P.3d 1284, 1286 n.4 (Alaska 2003)) (internal quotation marks omitted).

[36] *See* AS 27.19.010-.100.

[37] AS 27.19.030(a); *see* AS 27.19.100(6) (" '[R]eclamation plan' means a plan submitted by a miner under regulations adopted by the commissioner for the reclamation of a proposed mining operation.").

[38] AS 27.19.020.

[39] AS 27.19.080(b) ("The commissioner may adopt regulations to carry out the purposes of [the Reclamation statutes]."); 11 Alaska Administrative Code (AAC) 97.100-.990.

[40] 11 AAC 97.200-.250.

cuts, . . . and all other affected areas."[41]  The regulations also require the miner to post a performance bond.[42]

The record in this case indicates that Donlin's reclamation plan addressed the pit lake and that DNR approved Donlin's plan over ONC's objections, but that ONC did not appeal that decision to the superior court.  The sufficiency of the reclamation statutes and regulations, as well as Donlin's particular reclamation plan, are not before us in this appeal.  But it is clear that the legislature intended for the Department to consider the lasting impacts of mining operations, like the permanent pit lake ONC focuses on, under a separate statutory scheme.  And the legislature gave the Department the authority to prevent mining unless the miner submits a reclamation plan that, in the Commissioner's determination, suitably addresses those impacts.

Similarly, water pollution that results from mining is addressed under a separate statutory framework.  Under Alaska's statutes on water pollution control and waste disposal, "[a] person may not . . . take any action that results in the disposal or discharge of solid or liquid waste material or heated process or cooling water into the waters or onto the land of the state without prior authorization from the [D]epartment."[43]  Authorization by the Department may take several forms.[44]  For instance, individual permits can be issued for a facility or disposal activity.[45]  Or a general permit can be issued for a category of disposals within certain geographical limits for activities that comply with applicable environmental quality standards.[46]  The Department also has the discretion to establish standards for the waters of the state and

---

[41]   11 AAC 97.310(b)(6).

[42]   11 AAC 97.400.

[43]   AS 46.03.100.

[44]   *See* AS 46.03.100(b).

[45]   AS 46.03.100(b)(1).

[46]   AS 46.03.100(b)(2).

in so doing must "classify waters in accordance with considerations of best usage in the interest of the public."[47]

The Department also administers the National Pollutant Discharge Elimination System (NPDES) permit program "covering point source discharges to State waters, the pretreatment program covering industrial sources discharging to publicly owned treatment works, and federal facilities" under authority from federal law and the EPA.[48] The Department has adopted regulations to conform with NPDES program requirements under the Alaska Pollutant Discharge Elimination System (APDES) program.[49] As a part of the state permitting process for the Donlin mine, Donlin applied for an APDES permit. Water pollution caused by the pit lake is therefore subject to specific statutory and regulatory requirements.[50]

In light of these other statutory schemes, which more directly regulate the pit lake and its environmental impacts, we are persuaded that the Department was not required to consider the environmental impacts of the pit lake that will form after the

---

[47]     AS 46.03.080. In addition, any person seeking to "construct a hydraulic project, or use, divert, obstruct, pollute, or change the natural flow or bed" of a stream designated important for anadromous fish must obtain permits from the Department of Fish & Game. AS 16.05.871.

[48]     AS 46.03.100(h), (m) (describing pollution discharge permit program under authority of U.S. EPA); 33 U.S.C. § 1342(b) (authorizing states to administer NPDES programs); Letter from Elin D. Miller, Reg'l Adm'r, United States Env't Prot. Agency Region 10, to Larry Hartig, Comm'r, Alaska Dep't of Env't Conservation (Oct. 31, 2008), https://dec.alaska.gov/media/18519/epa-approval-letter-ak-npdes-103108.pdf.

[49]     *See* 18 AAC 83.005 ("The purpose of this chapter . . . is to implement the [APDES] point source wastewater discharge program in a manner that meets the purposes of AS 46.03 and in accordance with 33 U.S.C. § 1342 (Clean Water Act, sec. 402) and the requirements adopted by reference at 18 AAC 83.010.").

[50]     *See, e.g.*, 18 AAC 83.

mine is closed when deciding whether to grant the challenged water appropriation permits.

**C.      Article VIII Did Not Require The Department To Consider The Entire Donlin Mine When Approving Water Use Permits Or The Pipeline Right-Of-Way.**

ONC argues that even if the Department's permit decisions satisfied the applicable statutory schemes, they failed to satisfy article VIII of the Alaska Constitution. Article VIII mandates that natural resources belonging to the State are to be made "available for maximum use consistent with the public interest."[51]  According to ONC, the Department failed to ensure that the challenged water appropriations and pipeline right-of-way lease are consistent with the public interest because the Department granted them without considering the cumulative effects of all aspects of the Donlin mine proposal, from pipeline to port.   ONC's argument raises questions about the meaning and scope of article VIII — constitutional questions we review de novo.[52]  "In construing a constitutional provision, we must give it a 'reasonable and practical interpretation in accordance with common sense' and consonant with 'the plain meaning and purpose of the provision and the intent of the framers.' "[53]

ONC's argument relies heavily on our decision in *REDOIL*.  In that case we considered a challenge to the Department's decision to lease state lands for oil and gas production.[54]  The Alaska Lands Act required the Department to issue a written best interest finding that considered "the reasonably foreseeable cumulative effects of

---

[51]      Alaska Const. art. VIII § 1; *see also Sagoonick v. State*, 503 P.3d 777, 785 (Alaska 2022); *Sullivan v. Resisting Env't Destruction on Indigenous Lands* (*REDOIL*), 311 P.3d 625, 634-35 (Alaska 2013).

[52]      *Sagoonick*, 503 P.3d at 803.

[53]      *Legis. Council v. Knowles*, 988 P.2d 604, 607 n.11 (Alaska 1999) (quoting *ARCO Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992)).

[54]      *REDOIL*, 311 P.3d at 629-37.

exploration, development, production, and transportation for oil and gas or for gas only on the sale area."[55] The Act allowed the Department to use a "phased review approach."[56] This approach "recognizes that some disposals of oil and gas, or of gas only, may result in future development that cannot be predicted or planned with any certainty or specificity at the initial lease sale phase, and that any future development will be subject to detailed review before it takes place."[57] Accordingly, the Department analyzed the impacts resulting from the lease sale itself with specificity, but discussed future phases of exploration, development, production, and transportation "in general terms."[58] Because the Act required the Department to issue only a single written best interest finding, we considered whether the Department was nevertheless required to consider cumulative impacts at later phases of the project.[59]

We held in *REDOIL* "that consideration of cumulative impacts is constitutionally required throughout all the phases of a project."[60] Citing sections 1 and 2 of article VIII, we explained that although "[i]t is not the court's place to provide instruction on *how* the State should determine what action would be for the maximum benefit of the Alaskan people," we have a "duty to ensure that constitutional principles are followed."[61] We stated that article VIII requires "the State to take a 'hard look' at all factors material and relevant to the public interest," which "necessarily includes considering the cumulative impacts of a project."[62] We characterized cumulative

---

[55]     *Id.* at 630 (quoting former AS 38.05.035(g) (2010)).

[56]     *Id.* at 627.

[57]     *Id.*

[58]     *Id.* (internal quotation marks omitted).

[59]     *Id.* at 634-37.

[60]     *Id.* at 634.

[61]     *Id.* at 634-35 (emphasis in original).

[62]     *Id.* at 635.

impacts analysis as entailing a "whole-project analysis" that "takes into account all aspects of a project, considered as a whole and its existing development context."[63]

Relying on this language, ONC argues that before issuing the lease for the gas pipeline, the Department should have considered the cumulative impacts of the "whole project" — which ONC describes as the entire Donlin mine proposal. ONC makes the same argument with respect to the water appropriation permits.

The Department, Donlin, and Calista argue that the Department complied with its obligations under article VIII. Appellees variously argue the following: that *REDOIL*'s holding on cumulative impacts is limited to projects that involve phasing; that ONC misconstrues *REDOIL*'s reference to the "whole project"; and that in any event, the cumulative impacts of the Donlin proposal have been considered through the various statutory frameworks and permitting systems described earlier in our opinion.[64]

We do not agree with the Department and Donlin's argument that *REDOIL*'s holding about cumulative impacts applies only to phased review. Our holding about cumulative impacts was based on article VIII's duty to ensure that the use of the state's natural resources is "for the maximum benefit of its people."[65] We reasoned that "to ensure these principles are followed, it is necessary for the State to take a 'hard look' at all factors material and relevant to the public interest: this 'hard look' necessarily includes considering the cumulative impacts of a project."[66] The logic of this ruling is not limited to phased projects, even though *REDOIL* involved such a project. The risk of phasing projects over time is that the true cost-benefit calculus will not be recognized. This same risk is present if review of proposals to use state resources

---

[63]     *Id.* at 637 (quoting *Greenpeace, Inc. v. State, Off. of Mgmt. and Budget, Div. of Governmental Coordination*, 79 P.3d 591, 596 (Alaska 2003)).

[64]     *See* section III.B *supra*.

[65]     *REDOIL*, 311 P.3d at 635 (quoting Alaska Const. art. VIII, §§ 1-2).

[66]     *Id.*

is segmented across different permitting schemes: it is possible that certain impacts of the project will evade review. Therefore, we do not view *REDOIL*'s holding regarding the duty to consider cumulative impacts as limited to projects in which approval is phased over time.

Yet the *REDOIL* decision does not necessarily support ONC's position that the Donlin mine is the "whole project" for purposes of "cumulative impacts" analysis. We did not address in *REDOIL* how the "project under review" must be defined.[67] And we emphasized that it was "not the court's place to provide instruction on *how* the State should analyze cumulative impacts."[68] Indeed, we observed that "[t]he constitution entrusts the legislature with the discretion to determine how to ensure that use of [the State's] natural resources [is] 'for the maximum benefit of its people.' "[69]

This point goes to a fundamental difference between the project at issue in *REDOIL* and the one at issue in these cases. *REDOIL*'s discussion of "whole-project review," designed to enforce the mandate that resources owned by the State be used "for the maximum benefit of its people,"[70] does not cleanly map onto the Donlin project, which entails the development of privately owned resources on private lands. Because such resources are not reserved for the benefit of Alaska's people, whether to develop them is not a question to be answered through the public interest analysis under article VIII.

---

[67]     *See id.* at 636-37.

[68]     *Id*. at 637.

[69]     *Id.* at 635 (quoting Alaska Const. art. VIII, §§ 1-2).

[70]     *Id.* (quoting Alaska Const. art. VIII, § 2).

In *REDOIL* the "whole project" was the leasing of two million acres of state lands for extraction of state-owned oil and gas.[71]  The applicable statute required the State to prepare a written finding on whether the lease of these lands was in the best interests of the State.[72]  When we described the duty to consider cumulative impacts of a project, we endorsed the State's description of "whole-project analysis of a project under review"[73] — which was the extraction of state minerals on state lands.[74]  It was this project that had to be "considered as a whole" and in its "existing development context."[75]

By contrast, the core of the Donlin mine proposal is the extraction of privately owned minerals on private land. The proposed mine will be located on lands owned by the Kuskokwim Corporation and Calista Corporation.  And Calista owns the mineral estate for ANCSA lands in the region.

To be sure, developing the mine requires the use of certain state resources, such as the waters and access across state lands at issue here.  But the duty to decide

---

[71]     *See id.* at 626 (describing lease area at issue as comprising two million acres of state-owned tidal and submerged lands which contained significant oil and gas resources).

[72]     *Id.* at 627.

[73]     *Id.* at 636-37 (quoting *Greenpeace, Inc. v. State Off. of Mgmt. & Budget, Div. of Governmental Coordination*, 79 P.3d 591, 593-94 (Alaska 2003)).

[74]     *REDOIL*'s description of cumulative impacts was drawn from *Greenpeace*, which did not discuss cumulative impacts in connection with article VIII. *Id.* at 636-37 (quoting *Greenpeace*, 79 P.3d at 593-94, 596); *see also Greenpeace*, 79 P.3d at 597 (noting "a cursory argument that a NEPA-like cumulative impacts requirement can be inferred from various sections of article VIII . . . and from the 'public trust' responsibility implicit in those provisions" but concluding that "none of these sources directly or indirectly suggests the need for such analysis").  But it is worth noting that the "project under review" in *Greenpeace*, like the one in *REDOIL*, was the development of an offshore oil facility and pipeline on submerged lands owned by the State.  *Id.* at 592.

[75]     *REDOIL*, 311 P.3d at 637.

whether the use of state resources is consistent with the public interest does not require the State to decide, through the "whole-project analysis" described in *REDOIL*, whether otherwise lawful development of private resources on private lands is in the public interest.

The distinction can be illustrated with a hypothetical. Consider a development similar to the Donlin mine, located on privately-owned land less than five miles from existing highways. The owner of the land seeks a permit from the State to build a road across state-owned lands that can be used to haul ore and supplies. The impacts of the road and material transport will be relatively limited and subject to mitigation measures imposed by the State.

ONC's interpretation of *REDOIL* shifts the analysis from the use of state resources — the road — to the use of private resources — the mine. Under this approach, the State must consider all aspects of the mine and associated activity on private land, determine whether that activity and those impacts are in the public interest, and then decide whether to issue the road permit in light of those broader considerations. It does not matter if the impacts of the road itself are relatively small. Nor is it enough, in ONC's view, that the mining activities proposed by the landowner can satisfy laws and regulations designed to protect the interests of nearby landowners and the public, such as restrictions on water pollution, handling of mine waste, and reclamation of the mine site. Rather, the State must consider and decide whether it is in the public interest to allow otherwise lawful development of private resources on private lands.

ONC maintains that its version of "whole-project analysis" does not require the Department to decide how private resources may be used. Rather, ONC argues, the issue is "whether it is in the public interest to use state resources for a project involving private resources — a determination which necessarily involves analyzing effects stemming from the whole project." But this approach means, in practice, determining whether allowing the development of privately-owned resources is in the

public's interest.[76] In our view, such a rule would extend article VIII far beyond its command to ascertain whether the development of *state-owned* resources is in the public's interest.

Requiring the Department to use its discretion to determine whether development of the Donlin mine provides the maximum benefit to Alaskans would be especially dubious given the history of the lands that would be mined. These lands were chosen by ANCSA corporations as compensation for the loss of Alaska Natives' aboriginal title to their ancestral territories.[77] The lands were conveyed as an endowment for Alaska Native peoples to secure their future prosperity.[78] These lands and minerals are reserved for their benefit, not for the benefit of Alaskans generally. We agree with ONC that ANCSA corporations, like other private landowners, do not have an "absolute right" to use their lands however they wish. But we disagree with ONC's premise that if owners of ANCSA lands seek a permit to use state waters or a state right-of-way to facilitate the development of their property, all aspects of that development are subject to public interest analysis under article VIII. Only "natural

---

[76]    In the water rights case, ONC phrases the argument slightly differently, but the import is the same. It argues that "if state resources are intertwined in a private project, the state must consider the project overall to understand how that use of those state resources affects the public interest . . . . It is simply a decision about whether the public resources should be used to support and enable such effects."

[77]    *See* 43 U.S.C. § 1601(a) (declaring that "there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims"); 43 U.S.C. § 1611 (describing process for Native land selection under ANCSA).

[78]    *See* 43 U.S.C. § 1601(b) (declaring that settlement of claims "should be accomplished . . . in conformity with the real economic and social needs of Natives").

resources belonging to the State" are subject to the constitutional rule of maximum development consistent with the public interest.[79]

We do not mean to suggest that the State has no ability to protect public resources and private parties alike from impacts caused by industrial activities on private lands. The State has broad powers to regulate activity in the public interest.[80] As noted above, the State has enacted reclamation statutes and regulations, pollution discharge standards, dam safety requirements, and other regulations to protect both the public and State-owned resources from the effects of mining on privately-owned lands. Through these statutes and regulations, the State directly considers the various activities and impacts associated with mining. Indeed, the State directly addressed ONC's arguments about effects of the pit lake — the element at the heart of ONC's cumulative impacts argument — when evaluating Donlin's reclamation plan. But those decisions are not before us in this appeal, and we do not address their merits. We hold only that the Department was not required, when deciding whether to issue water appropriation and pipeline right-of-way permits for use in mining privately owned minerals on private lands, to condition those permits on an analysis of the cumulative impacts of the mining itself.

Other cases relied upon by ONC do not demonstrate that the entire Donlin mine must be considered to satisfy article VIII. ONC points to our reasoning in

---

**79** Alaska Const. art. VIII, § 2; *accord* Alaska Const. art. VIII, § 1 ("It is the policy of the State to encourage the settlement of *its* land and the development of *its* resources by making them available for maximum use consistent with the public interest." (emphasis added)).

**80** *See, e.g.*, *R&Y, Inc. v. Mun. of Anchorage*, 34 P.3d 289, 297 (Alaska 2001) ("[I]n order to protect the public welfare, governments may exercise their police powers . . . ."); *State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1211 n.37 (Alaska 2010) (indicating that state has "police power to regulate for the common good").

*Kachemak Bay Watch, Inc. v. Noah*[81] and *Trustees for Alaska v. Gorsuch*[82] as "reflect[ing] the danger of ignoring cumulative impacts and restricting analysis based on jurisdictional lines alone." But *Kachemak Bay Watch* and *Gorsuch* do not support constitutionally requiring consideration of the Donlin mine under the Water Use Act and ROWLA because these cases involved statutory requirements to consider cumulative impacts. These cases do not describe the requirements of article VIII.

In *Kachemak Bay Watch* we determined that in approving aquatic farming permits, the Department had impermissibly merged two statutory provisions, which governed identification of suitable aquatic farming sites and permitting of such sites.[83] We analogized this "collapsed" approach to phasing, explaining that "such combination of the statutes precludes any analysis of the overall impact on the affected areas" and "limits in-depth consideration of possible negative consequences."[84] Our decision in *Kachemak* reflected the statutory scheme, rather than the requirements of article VIII.

Similarly, our decision in *Gorsuch* was based on interpretation of the Alaska Surface Coal Mining Control and Reclamation Act. The statute was intended "to prevent the adverse effects to society and the environment resulting from unregulated surface coal mining operations" and "to assure that surface coal mining operations are conducted in a manner that will prevent unreasonable degradation of land and water resources."[85] We held that the Department could "not ignore cumulative effects of mining and related support facilities by unreasonably restricting its jurisdiction or by permitting facilities separately."[86] Our holding rested on the

---

[81]    935 P.2d 816 (Alaska 1997).

[82]    835 P.2d 1239 (Alaska 1992).

[83]    935 P.2d at 823.

[84]    *Id.*

[85]    *Gorsuch*, 835 P.2d at 1246 (quoting AS 27.21.010(b)).

[86]    *Id.*

conclusion that considering the cumulative impacts of the "entire mining operation" was necessary to fully carry out the statutory purpose.[87]  The statute expressly required the Department to consider the cumulative impacts of surface coal mining on the area's hydrology.[88]  Our holding was not based on article VIII.

Therefore, we reject ONC's argument that the Department violated article VIII of the Alaska Constitution by declining to consider the cumulative impacts of the entire Donlin mine, from pipeline to port, when deciding whether to issue the challenged water appropriation permits and pipeline right-of-way lease.

## IV.    CONCLUSION

We AFFIRM the judgment of the superior court in each case.

---

[87]    *Id.*

[88]    *Id.* at 1246 n.5 (citing AS 27.21.180(c)(3)).